RECEIPT # ____
AMOUNT $ 250
SUMMONS ISSUED N/A
LOCAL RULE 4.1 ____
WAIVER FORM ____
MCF ISSUED ____
BY DPTY. CLK. B
DATE 9.12.05

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

OPUS, INC.

Plaintiff,

v.

PAMELA CAMPBELL and ROBERT CAMPBELL

Defendants.

05 CA 11843 NMG

MAGISTRATE JUDGE ____

**NOTICE OF REMOVAL TO FEDERAL COURT**
**PURSUANT TO 28 U.S.C. §§ 1332 AND 1441 ET SEQ.**

The Defendants, Pamela and Robert Campbell by their attorney, Goulston & Storrs P.C., pursuant to 28 U.S.C. §§ 1332 and 1441 et seq. hereby give notice of removal of proceedings in the Trial Court of Massachusetts, Superior Court Department, Norfolk County between the above-captioned parties bearing Civil No. NOCV2005-01456 to the United States District Court for the District of Massachusetts for the reasons set forth below.

1. Removal is authorized pursuant to 28 U.S.C. § 1441(a) where the District Courts of the United States have original jurisdiction. The District Court has diversity jurisdiction pursuant to 28 U.S.C. §1332 where the matter in controversy exceeds the sum of $75,000 exclusive of interest and costs and is between citizens a state and citizens of a foreign state. As set forth below, these requirements are met.

2. The Plaintiff, Opus, Inc. has alleged that it is a Massachusetts corporation with a principal place of business at 24 William Way, Bellingham, Massachusetts. This allegation is set

3.     The Defendants, Pamela and Robert Campbell are Canadian citizens and individuals residing at 44 Green Acres, Morin Heights, Quebec, Canada. See Complaint, ¶¶ 2-3.

4.     Accordingly, there is complete diversity of citizenship among the parties to this action.

5.     The only process, pleadings or order received by Defendants in this action are the Complaint and a summons, dated August 22, 2005 ("Summons"), which were received by the Defendants on August 24, 2005. A copy of the Summons is annexed hereto as Exhibit 2.

6.     The Complaint alleges that the Plaintiff had the right to terminate the Defendants' employment for just cause based on purported breaches of contract by the Defendants and that the Plaintiff has incurred damages in an amount "in excess of $25,000". See Complaint, ¶ 27.

7.     The Plaintiff further alleges that the Defendants have purportedly been "unjustly enriched by their receipt of "generous monetary benefits" from the Plaintiff by way of salary and other employment remuneration. See Complaint, ¶ 38.

8.     The Plaintiff alleges that it is entitled to a declaratory judgment that it had just cause to terminate the Defendants' employment and thus need not pay the Defendants what they are owed for the remainder of their Employment Agreements. See Complaint, ¶ 48.

9.     The Defendants' Employment Agreements, which are attached to the Complaint as Exhibits A and B respectively, contemplate that each Defendant will receive an annual salary of $75,000 and annual incentive bonuses equal to 5% of the amount by which net sales of "Eligible Products" exceed an "Applicable Base Amount" as defined in the Employment Agreements. See e.g., Complaint, Ex. A, § 4. Each of the Defendants' Employment Agreements further contemplates that the Plaintiff will pay to each Defendant two equal installments of $32,500 ("Non-Competition Payments") payable on the first and second anniversary dates of the

Employment Agreements, *i.e.* October 3. 2004 and October 3, 2005. See id., § 5(a) Thus, the Defendants each received a $32,500 Non-Competition Payment (totaling $65,000) on October 3, 2004 and are each entitled to a further Non-Competition Payments in the same amount on October 3, 2005 under the terms of their Employment Agreements.

10. The Defendants were employed by the Plaintiff from October 3, 2003 through August 15, 2005, and thus each received $75,000 salaries (totaling $150,000) for the 12 month period October 3, 2003 through October 3, 2004 and each received approximately $66,000 of salary (totaling $132,000) for the period October 4, 2004 through August 15, 2005. Thus the total salaries received by both Defendants during the period in which they were employed by the Plaintiff is approximately $282,000.

11. In view of the foregoing, the damages sought by the Plaintiff for unjust enrichment, corresponding to the salary and Non-Competition Payments received by the Defendants under the Employment Agreements total at least $347,000 (*i.e.* $282,000 in paid salary and $65,000 in paid Non-Competition Payments).[1]

12. Moreover, the effect of the declaratory judgment that the Plaintiff seeks would be to excuse the Plaintiff from paying a total of $65,000 of further Non-Competition Payments due on October 3, 2005 (See e.g., Complaint, Ex. A § 10(b)) and $75,000 of annual salary for each Defendant until the end of the term of each Employment Agreement on October 3, 2008. See id., § 2 (five year employment term). Thus the payments to the Defendants under the remainder of the term Employment Agreements that the Plaintiff seeks to avoid in this lawsuit total over $515,000.

[1] The Plaintiff's total claim would increase in the event that the Plaintiff is seeking to recover amounts paid by way of signing bonuses and car allowances under the Employment Agreements as well. See Complaint, Ex. A , §§ 4, 7.

13. Accordingly, the amount in controversy is this matter is in excess of $862,000 (*i.e.* $347,000 plus $515,000) and thus far exceeds the $75,000 threshold for the District Courts of the United States to have jurisdiction under 28 U.S.C. § 1332(a).

14. Thus, because this Court has original jurisdiction of this matter based on the diversity of citizenship of the parties and the amount in controversy, removal is proper pursuant to 28 U.S.C. §§ 1441 et seq.

PAMELA CAMPBELL AND
ROBERT CAMPBELL,

By their attorney,

Richard J. Rosensweig (BBO #639547)
GOULSTON & STORRS, P.C.
400 Atlantic Avenue
Boston, MA 02110-3333
(617) 482-1776

Dated: September 12, 2005

**Certificate of Service**

I, Richard J. Rosensweig, hereby certify that on September 12, 2005 I served the foregoing Notice of Removal to Federal Court Pursuant to 28 U.S.C. §1332 and 1441 et seq. first class mail, postage prepaid, upon counsel for the Plaintiff.

Richard J. Rosensweig

COMMONWEALTH OF MASSACHUSETTS

NORFOLK, ss.

SUPERIOR COURT DEPARTMENT
OF THE TRIAL COURT
CIVIL ACTION NO.

OPUS, INC.,
Plaintiff,
v.

PAMELA CAMPBELL and
ROBERT CAMPBELL,
Defendants.

**COMPLAINT AND JURY DEMAND**

Introduction

This is a complaint for breach of contract, breach of the implied covenant of good faith and fair dealing, unjust enrichment, and for a declaration by the Court, pursuant to G.L. c. 231A, §1, that the plaintiff, Opus, Inc., had "just cause" to terminate the defendants' employment as defined in the defendants' respective employment agreements.

Parties, Jurisdiction and Venue

1. Plaintiff, Opus, Inc., is a Massachusetts corporation with a principal place of business at 24 William Way, P.O. Box 525, Bellingham, County of Norfolk, Massachusetts.

2. Defendant, Pamela Campbell, is an individual formerly employed by Opus, who currently resides at 44 Green Acres, Morin Heights, Quebec, Canada, JOR 1H0.

3. Defendant, Robert Campbell, is an individual formerly employed by Opus, who currently resides at 44 Green Acres, Morin Heights, Quebec, Canada, JOR 1H0. On information and belief, the defendants are husband and wife.

4. The Court has jurisdiction over this matter because the action involves a request, pursuant to G.L. c.231A, §1, for a declaration of rights and obligations under an employment

agreement, which all parties agreed would be resolved by a Massachusetts Court (See Employment Agreements of Pamela Campbell and Robert Campbell, § 19, attached hereto as Exhibit A and B, respectively). Further, the defendants had numerous and sufficient contacts with the Commonwealth of Massachusetts to satisfy the requirements of both the Massachusetts Long-Arm Statute, G.L. c. 223A, and the Due Process Clause of the United States Constitution.

5. Venue is proper in this Court because at least one of the parties resides in, or has a principal place of business in, Norfolk County.

## Factual Allegations

6. The Plaintiff, Opus, Inc., is a privately held home and garden products company, specializing in the distribution and sale of bird feeders, bird houses, bird baths, outdoor clocks and thermometers, patio furniture and other related products.

7. On or about October 3, 2003, the plaintiff purchased the assets of The Company Garden, Inc., ("TCG"), an Ontario-based business engaged in the design, manufacture and distribution of bird houses, pursuant to an Asset Purchase Agreement. Prior to its purchase, TCG was owned by defendant Robert Campbell and a third-party, and operated principally by the defendants.

8. As an inducement to entering into the Asset Purchase Agreement, the plaintiff required the defendants to continue working for the plaintiff for a five-year period and to execute employment agreements reflective of the terms and conditions under which they would work for the plaintiff. (See Exhibits A and B, p. 1).

9. Pursuant to Section 3 ("Duties") of the defendants' employment agreements,[1] the defendants' primary duties and responsibilities were in sales, though it was understood that

[1] Aside from the name of the employee, the defendants' employment agreements are identical in all material respects.

defendant Robert Campbell would focus more on product development. Their employment was full-time and they were "at all times" required to "use [their] best efforts to discharge [their] duties in furtherance of the [plaintiff's] interests." (See Exhibit A and B, § 3).

10. Pursuant to Section 4 of their employment agreements, the plaintiff paid the defendants significant annual base salaries and signing bonuses for their anticipated full-time work and best efforts on behalf of the company.

11. Pursuant to Section 5 of the employment agreements, and as an inducement for each of the defendants to devote their full-time and best efforts on behalf of the company, the plaintiff agreed to pay incentive bonuses on predetermined criteria.

12. Under Section 8(b) ("Termination") of the defendants' employment agreements, the plaintiff had the right, upon written notice, to terminate the defendants' employment for just cause. "Just Cause" is defined under the employment agreements to include, among other circumstances, the defendants' "willful and substantial misconduct," "gross neglect of duties," "repeated failure to be present at work during normal business hours" and/or "the material breach of any other covenant, condition, or agreement contained in the employment agreement or in the Asset Purchase Agreement." (See Exhibit A and B, § 8(b)(i), (ii), (v), and (ix)).

13. Section 8(b) further provided that due to the fact that the defendants were married, the defendants acknowledged and agreed that their employment was linked, and that should one of them be terminated for "just cause," the other defendant's continued employment would create a difficult and unacceptable situation for the plaintiff, constituting "just cause" to terminate the remaining defendant's employment as well.

14. The defendants executed their respective employment agreements on or about October 3, 2003, and began working for the plaintiff from home at their Quebec residence immediately thereafter.

15. Within a year of her employment with the plaintiff, primarily on account of disappointing sales performance in her region, the plaintiff suspected that defendant, Pamela Campbell, was not working full-time or using her best efforts at all times to discharge her duties in furtherance of the plaintiff's interests as required by her employment agreement.

16. In or around the fall of 2004, the plaintiff issued the defendant Mrs. Campbell a 15-month sales quota of $100,000 (Canadian dollars). As of July 31, 2005 (10 months into the quota period), Mrs. Campbell was $52,000 below her $100,000 sales quota.

17. The plaintiff's suspicions concerning Mrs. Campbell's lack of effort and performance led the company to retain a private investigation firm to monitor the defendants' activities for seven business days in July, 2005. The firm's written report and video surveillance substantiated the plaintiff's suspicions in that neither defendant was observed working during business hours on any day of observation. Rather, one or both defendants was observed going to an ice cream shop, grocery store, visiting friends, mowing the lawn, lounging in the yard, at the gym, attending a beach party, and other like recreational events.

18. At approximately the same time, the plaintiff began to monitor the email activity of the defendants, which revealed minimal business communications and activities on their part.

19. As a consequence, the plaintiff concluded that the defendants were not (and had not for some time) working full-time or using their best efforts at all times to discharge their duties in furtherance of the plaintiff's interests as required by Section 3 of their employment agreements.

20. On August 12, 2005, the plaintiff provided defendant, Pamela Campbell, with written notice that, effective August 15, 2005, it was terminating her employment for "just cause" pursuant to Section 8(b) of her employment agreement. (A true and accurate copy of the plaintiff's August 12, 2005 termination letter to Mrs. Campbell is attached hereto as Exhibit C).

21. Pursuant to Section 8(b) of his employment agreement, the plaintiff terminated defendant, Robert Campbell's employment because his wife's employment had been terminated for "just cause" under her employment agreement, which constituted "just cause" to terminate his employment under his agreement as well. (A true and accurate copy of the plaintiff's August 12, 2005 termination letter to Mr. Campbell is attached hereto as Exhibit D). In addition, the plaintiff terminated Mr. Campbell's employment because the investigative report revealed that he was not working on behalf of the company during business hours on any day of the firm's investigation.

22. By letter dated August 17, 2005, the defendants (through their counsel) disputed that the plaintiff had "just cause" to terminate their employment. (A true and accurate copy of the letter from defendants' counsel dated August 17, 2005 is attached hereto as Exhibit E).

## COUNT I
## (Breach of Contract)

23. The plaintiff repeats and realleges Paragraphs 1 through 22 of this Complaint, and incorporates them as if fully set forth herein.

24. Pursuant to their employment agreements, Mr. and Mrs. Campbell had contractual duties to work full-time and to use their best efforts at all times to discharge their duties in furtherance of the plaintiff's interests.

25. The plaintiff has fully performed all of its duties and obligations under the employment agreements executed by the defendants.

26. The defendants, Mr. and Mrs. Campbell have materially breached the terms of their employment agreements with the plaintiff by failing to work full-time or to use their best efforts at all times to discharge their duties in furtherance of the plaintiff's interests.

27. As a direct and proximate result of the defendants' material breach of their employment agreements, the plaintiff has incurred substantial damages, including compensatory damages, in an amount in excess of $25,000.00.

WHEREFORE, the plaintiff demands judgment against the defendants in an amount to be determined by the Court, plus interest, costs, attorneys' fees, and such other relief as this Court deems just and proper.

COUNT II
(Breach of the Implied Covenant of Good Faith and Fair Dealing)

28. The plaintiff repeats and realleges Paragraphs 1 through 27 of this Complaint, and incorporates them as if fully set forth herein.

29. In Massachusetts, every contract contains an implied covenant of good faith and fair dealing between the parties to it.

30. The defendants' failure to work full-time or to use their best efforts at all times to discharge their duties in furtherance of the plaintiff's interests had the effect of destroying or injuring the plaintiff's right to receive the fruits of the employment agreements with the defendants.

31. The defendants' actions or failure to act constitute a material breach of the implied covenant of good faith and fair dealing.

32. The defendants' material breaches of said covenant were willful and intentional, and were done in wanton and intentional disregard of the plaintiff's rights and interests.

33. As a direct and proximate result of the defendants' breach of their duties of good faith and fair dealing, the plaintiff has incurred substantial damages, including compensatory damages, in an amount in excess of $25,000.

WHEREFORE, the plaintiff demands judgment against the defendants in an amount to be determined by the Court, plus interest, costs, attorneys' fees, and such other relief as this Court deems just and proper.

COUNT III
(Unjust Enrichment)

34. The plaintiff repeats and realleges Paragraphs 1 through 33 of this Complaint, and incorporates them as if fully set forth herein.

35. Pursuant to the defendants' employment agreements, the plaintiff paid the defendants significant annual base salaries and signing bonuses for their anticipated full-time work and best efforts on behalf of the company.

36. The defendants failed to work full-time or to use their best efforts at all times to discharge their duties in furtherance of the plaintiff's interests, in material breach of their employment agreements with the plaintiff.

37. The defendants have accepted, used and enjoyed the monetary benefits conferred by the plaintiff with the knowledge that they were obligated to work full-time and to use their best efforts at all times to discharge their duties in furtherance of the plaintiff's interests.

38. The defendants have been unjustly enriched by their receipt of generous monetary benefits from the plaintiff without having earned same by working full-time or using their best efforts at all times to discharge their duties in furtherance of the plaintiff's interests.

WHEREFORE, the plaintiff demands judgment against the defendants in an amount to be determined by the Court, plus interest, costs, attorneys' fees, and such other relief as this Court deems just and proper.

COUNT IV
(Declaratory Judgment – G.L. c. 231A §1)

39. The plaintiff repeats and realleges Paragraphs 1 through 38 of this Complaint, and incorporates them as if fully set forth herein.

40. In consideration for agreeing to execute the Asset Purchase Agreement and to pay the defendants significant annual base salaries and signing and incentive bonuses, the plaintiff required, among other consideration, that the defendants work full-time and to use their best efforts at all times to discharge their duties in furtherance of the plaintiff's interests.

41. The defendants agreed to work full-time and to use their best efforts at all times to discharge their duties in furtherance of the plaintiff's interests in exchange for the company's execution of the Asset Purchase Agreement and significant annual base salaries and signing and incentive bonuses, and such terms were memorialized in the Asset Purchase Agreement and/or their respective employment agreements.

42. The defendants' agreement to work full-time and to use their best efforts at all times to discharge their duties in furtherance of the plaintiff's interests was a material inducement for the plaintiff to execute the Asset Purchase Agreement, acquire the business of TCG or pay the defendants significant annual base salaries and signing and incentive bonuses as set forth in Sections 4 and 5 of their employment agreements. The plaintiff would not have agreed to execute the Asset Purchase Agreement, acquire the business of TCG or pay the defendants significant annual base salaries or signing and incentive bonuses had the defendants

not agreed to work full-time and to use their best efforts at all times to discharge their duties in furtherance of the plaintiff's interests.

43.    As set forth more fully above, the defendants failed to work full-time or to use their best efforts at all times to discharge their duties in furtherance of the plaintiff's interests.

44.    The defendants' aforementioned failure to work full-time or to devote their best efforts at all times to discharge their duties in furtherance of the plaintiff's interests constitute a material breach of their employment agreements.

45.    The plaintiff contends that as a result of the defendants' failure to work full-time or to use their best efforts at all times to discharge their duties in furtherance of the plaintiff's interests, in material breach of their employment agreements, the plaintiff had just cause to terminate the defendants' employment as that term is defined in Section 8(b) of the defendants' employment agreements.

46.    The defendants disagree with the plaintiff's contention that the company had just cause to terminate their employment. Therefore, an actual controversy has arisen between the plaintiff and the defendants as to the parties' rights and obligations under the defendants' employment agreements.

47.    Despite having suffered damages as a result of the defendants' material breach of their employment agreements, the plaintiff has made a good faith effort to resolve this controversy prior to filing suit.

48.    The plaintiff is entitled to a declaration by this Court that the defendants have materially breached their respective employment agreements and that, therefore, the plaintiff had just cause to terminate the defendants' employment as that term is defined in Section 8(b) of their employment agreements.

WHEREFORE, the plaintiff respectfully requests that this Court enter judgment declaring the rights and obligations of the parties under the defendants' employment agreements, including a declaration that the defendants have materially breached their respective employment agreements and that, therefore, the plaintiff had "just cause" to terminate their employment as that term is defined in Section 8(b) of the defendants' employment agreements, to otherwise award the plaintiff its costs and attorneys' fees, and enter such other relief as the Court deems just and proper.

JURY DEMAND

The plaintiff, Opus, Inc., respectfully requests a trial by jury on all issues so triable.

Respectfully submitted,

OPUS, INC.

By its attorneys,

Thomas J. Gallitano, BBO # 550745
Michael R. Bernardo, BBO # 648310
CONN KAVANAUGH ROSENTHAL
PEISCH & FORD, LLP
Ten Post Office Square
Boston, MA 02109
(617) 482-8200

Dated: August 22, 2005

A

EMPLOYMENT AGREEMENT

EMPLOYMENT AGREEMENT made this 3rd day of October, 2003 by and between OPUS, Inc., a Massachusetts corporation with a principal place of business at 24 William Way, P.O. Box 525, Bellingham, MA 02019-0525 (the "Company") and Pamela Campbell, an individual residing at 44 Green Acres, Morin Heights, Quebec, Canada J0R 1H0 (the "Employee").

WHEREAS, as of the date hereof the Company has purchased substantially all of the assets of The Company Garden Inc., an Ontario corporation ("TCG"), pursuant to an Asset Purchase Agreement executed by and among the Company, TCG, the Employee, and Robert Campbell (the "Asset Purchase Agreement");

WHEREAS, as an inducement to entering into the Asset Purchase Agreement and closing on the purchase of assets from TCG, the Company has required and Employee has agreed to enter into an employment agreement upon the terms set forth herein;

NOW, THEREFORE, in consideration of the mutual covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Company and the Employee hereby agree as follows:

1. Employment. The Company hereby agrees to employ the Employee, and the Employee hereby accepts such employment, upon the terms and conditions hereinafter set forth. The Employee represents and warrants to the Company that her employment by the Company and the performance of her duties as contemplated by this Agreement do not and will not violate the terms or conditions of any other agreement or understanding by which the Employee is bound or subject, and that the Employee knows of no basis for any claim that she is so bound or subject.

2. Term. This Agreement shall commence on the date hereof, and shall continue in effect for a term of five (5) years unless earlier terminated as provided in Section 8 hereof.

3. Duties. The Employee's primary responsibilities with the Company shall be in sales with particular emphasis on growing the business of the product line previously introduced by TCG under the Country Nests Nids De Campagne® brand, as such line may hereafter be modified, enhanced and expanded by the Company during the term hereof. Employee shall have such other responsibilities consistent with her general experience and training as may be prescribed by the President of the Company from time to time. Employee acknowledges that her employment by the Company is full-time and that she shall at all times use her best efforts to discharge her duties in furtherance of the Company's interests. The parties hereto affirm that Employee shall discharge her duties hereunder from her home unless a substitute location reasonably proximate to Employee's home is procured and such location is reasonably acceptable to Employee. The Employee agrees that in the course of her performance of duties, she will be required to travel both domestically and internationally as deemed necessary or appropriate by the Company, including without limitation, travel to sales and strategic planning

meetings conducted by the Company. All pre-approved travel expenditures will be paid by the Company subject to Employee's compliance with travel and expense guidelines utilized by the Company for its sales employees generally.

4.      Salary/Signing Bonus. As compensation for the services to be rendered by the Employee under this Agreement, the Company shall pay to the Employee a salary of Seventy-Five Thousand ($75,000) U.S. Dollars per year (the "Salary"), payable in accordance with the Company's normal payroll policies. In addition to payment of Salary, the Company also agrees to remit to Employee a one-time signing bonus of Forty Thousand ($40,000) U.S. Dollars, payable upon execution of this Agreement. The Company agrees to adjust the signing bonus with a payment on or before January 31, 2004 of an additional Ten Thousand ($10,000) U.S. Dollars if and only if "net sales" by the Company of "Country Nests Products" for the period September 1, 2003 through December 31, 2003 exceeds net sales of Country Nests Products made by TCG for the same quarterly period in 2002. For purposes of this Agreement, (i) "net sales" means gross sales less GST, PST, any and all other sales and excise taxes, returns, allowances, and discounts and (ii) "Country Nests Products" means those products previously sold by TCG under the Country Nests Nids De Campagne® mark, together with all new and substitute products hereafter introduced by the Company for sale under the Country Nests Nids De Campagne® mark. In recognition that the Company will not have closed on its acquisition of TCG assets until after September 1, 2003, the parties agree that sales of Country Nests Products from and after September 1, 2003 shall include sales made by TCG from and after such date through the date of closing.

5.      Incentive Bonus.

(a)      During each year of Employee's employment hereunder, Employee will be entitled to an annual incentive bonus equal to five (5%) percent of the amount by which net sales of "Eligible Products" (as measured in U.S. Dollars for the twelve (12) months ending on the day preceding each anniversary date of this Agreement) exceeds the "Applicable Base Amount". For purposes hereof, the initial Applicable Base Amount shall be One Million Sixty Two Thousand One Hundred Forty-Three ($1,062,143) U.S. Dollars, such amount representing net sales by TCG (as converted to U.S. Dollars) for the year ended July, 31, 2003. Commencing with the second and all successive years of the term of this Agreement, the Applicable Base Amount shall be the greater of (i) One Million Sixty Two Thousand One Hundred Forty-Three ($1,062,143) U.S. Dollars or (ii) the highest level of net sales of Eligible Products achieved for any twelve (12) month period ending on the day prior to an anniversary date of this Agreement. As used in this Agreement, the term "Eligible Products" means products now and hereafter sold by the Company under the Country Nests Nids De Campagne® brand.

*For illustrative purposes only, assume this Agreement is executed September 30, 2003 and that net sales of Eligible Products are $1.3M and $1.7M for the twelve months ended on September 29, 2004 and September 29, 2005 respectively. The incentive bonus for the first employment year ended September 29, 2004 would be determined as follows: ($1,300,000 - $1,062,143) x 5% = $11,892.85. The incentive bonus for the second employment year ended September 29, 2005 would be ($1,700,000 - $1,300,000) x 5% = $20,000.*

(b) All incentive bonuses will be paid within forty-five (45) days of the close of each anniversary date of this Agreement. The Company agrees that it will increase the amount of the incentive bonus to six (6%) percent for any employment year in which the Company's gross margin for sales of Eligible Products equals or exceeds 45.2%. The term "gross margin" means net sales less cost of product, agent commissions, duty, freight, and broker fees. The Company agrees to include a statement of calculation of gross margin with each remittance of incentive bonus earned hereunder.

(c) The parties hereto acknowledge that in the event the Company should sell all or substantially all of its assets and the purchaser thereof shall refuse either to assume this Agreement or assume the incentive bonus obligations owed to Employee under this Section 5, Employee will forfeit her valuable right to earn the bonus amounts provided in this Section 5. Accordingly, the Company agrees that upon the occurrence of any such event, Employee shall be deemed to have earned a one-time fixed payment in lieu of the incentive bonus in the amount stated below:

| Date of Sale | Amount Earned |
|---|---|
| Prior to 2nd anniversary of this Agreement | $75,000 |
| Between 2nd and 3rd anniversary of Agreement | $50,000 |
| Between 3rd and 4th anniversary of Agreement | $40,000 |
| Between 4th and 5th anniversary of Agreement | $20,000 |

The Company agrees to remit the amount so earned within ten (10) days following closing of any such sale. Notwithstanding the foregoing, should a purchaser offer employment to Employee at a comparable base salary with an incentive bonus substantially comparable to that stated in subsection (a) above, and such employment is refused by Employee, the Company shall be relieved of its obligation to remit any fixed payment to Employee under this subsection (c) and Employee shall be deemed to have forfeited her right to receive any payment under this subsection.

6. Reimbursement of Business Expenses. The Company agrees to reimburse the Employee for all reasonable out-of-pocket expenses incurred in connection with Company business in accordance with the policies of the Company, as those policies may be amended or modified from time to time. Reimbursable expenses include, without limitation, authorized travel, cell phone, office and business supplies.

7. Vacation/Benefits.

(a) The Employee shall be entitled to four (4) weeks paid vacation per year.

(b) The Company shall provide the Employee with dental and prescription coverage comparable to benefits historically provided to Employee by TCG.

(c) The Company shall provide the Employee with an automobile allowance in the amount of Three Hundred Fifty ($350) U.S. Dollars per month during the term of this



Agreement. Employee shall be responsible for all insurance, registration, service, repair, fuel (subject to mileage reimbursement for business use) and any and all other expenses associated with the operation and maintenance of such vehicle.

8. Termination.

(a) This Agreement shall terminate immediately in the event of the Employee's death. Should the Employee become physically or mentally disabled or ill to the extent that she is unable to substantially perform her duties hereunder to the reasonable satisfaction of the President of the Company (i) for a period of ninety (90) consecutive days, or (ii) for shorter periods aggregating ninety (90) days during any period of three hundred sixty-five (365) consecutive calendar days, the Company may, at its option, elect to terminate the Employee's employment at any time thereafter while such disability or illness continues by giving written notice thereof to the Employee. If the Company believes Employee to be physically or mentally incapable of performing the services required of her hereunder, the Company may require Employee to be examined by a physician selected by it to verify or to determine the extent of such disability and such physician's determination, as certified to the Company, as to whether Employee is or is not capable of performing the services required of her hereunder, shall be binding and conclusive. In the event Employee's employment hereunder shall terminate on account of death or disability, the Company agrees that it will continue to pay to the Employee (or her estate following death), as a death or disability benefit, the incentive bonus referenced in Section 5 above to the extent earned during the balance of the term, as fully as if Employee's employment had not in fact terminated on account of death or disability. In addition, should Employee's employment hereunder terminate on account of death or disability prior to the date that Employee has received payment in full for her non-competition and non-solicitation covenants set forth in Section 10 hereof, the Company hereby agrees that it will pay the remaining amounts due in consideration of such covenants as a death benefit and/or as a separation/disability benefit at the time(s) set forth in said Section 10 for payment thereof.

(b) In addition to termination on account of death or disability, the Company may, upon written notice to the Employee, terminate the Employee's employment under this Agreement for just cause. As used herein, "just cause" shall mean the Employee has engaged in: (i) willful and substantial misconduct with respect to the business and affairs of the Company; (ii) gross neglect of duties, dishonesty, deliberate disregard of any material rule or policy of the Company, or the commission by the Employee of any other action with intent to injure the Company; (iii) commission of an act involving larceny, embezzlement, or conversion, or any act involving the misappropriation of Company funds; (iv) any activity resulting in a conviction for any crime pertaining or relating to the Company; (v) repeated failure to be present at work during normal business hours; (vi) violation of an express directive or any rule or regulation established by the President of the Company, which violation continues uncured for ten (10) days after written notice thereof has been given to the Employee (provided that Employee shall not have the right to cure successive violations of the same or similar directive); (vii) abuse of alcohol or other drugs; (viii) violation of the confidentiality, non-competition, or non-solicitation covenants set forth herein, or (ix) the material breach of any other covenant, condition or agreement contained in this Agreement or in the Asset Purchase Agreement. In addition to the foregoing, Employee understands that her employment is linked to the



employment by the Company of her husband, Robert Campbell. Should the Company terminate Robert Campbell's employment for just cause under the terms of his employment agreement, Employee acknowledges that her continued employment with the Company would create a difficult and unacceptable situation for the Company constituting just cause for the Company to terminate Employee hereunder. In the event Employee shall be terminated for just cause, Employee shall be entitled to receive all compensation then due and owing together with any incentive bonus previously earned and unpaid as of the date of such termination.

9. Confidentiality.

The Employee hereby acknowledges that during the term of her employment hereunder, she will have access to confidential information of the Company, including marketing strategies, concepts, product designs, names of suppliers, customers, channel partners, manufacturers, and key employees, inventions, branding strategies, sales, cost and select financial information, and all information which prior to the date of acquisition of the assets of TCG by the Company was properly regarded as confidential and proprietary by TCG (collectively, "Confidential Information"). During the term of Employee's employment and at any time thereafter, Employee agrees that she shall not divulge or cause to be divulged, communicate or cause to be communicated, publish or cause to be published, or otherwise disclose or cause to be disclosed to any person, firm, corporation, association, or entity, any of the Confidential Information except as required to discharge her employment responsibilities hereunder. For purposes hereof, Confidential Information shall not include information which (a) at the time of disclosure to Employee was generally known to the relevant trade so as to no longer be a protectable trade secret, or (b) was lawfully received by Employee from a third party who independently, without prompting or assistance by Employee, developed or acquired such Confidential Information free of any obligation, express or implied, to the Company with respect thereto.

10. Non-Competition and Non-Solicitation.

(a) The Employee hereby acknowledges that the Company would not have entered into the Asset Purchase Agreement to purchase the assets of TCG or entered into this Agreement in the absence of Employee's covenants set forth in this Section 10. In furtherance thereof, Employee understands that the Company's success in operating and expanding the business previously conducted by TCG is highly dependent on maintaining customer, vendor, and manufacturing relationships and the goodwill associated therewith. Accordingly, in order to protect the goodwill of the Company and all Confidential Information, Employee hereby agrees that during the term of her employment by the Company and for a period of two (2) years following any termination or expiration thereof, Employee will not:

(i) directly or indirectly, either as an individual for Employee's own account, or as a partner or joint venturer, or as an advisor, consultant, representative, employee, officer, director, or shareholder of any corporation or other business entity, or in any other capacity, engage in, enter into or participate in any way in any enterprise that is involved in the development, manufacture, distribution, or sale within the United States or

Canada of bird feeders, bird houses, knewel posts, candles, watering cans, Adirondack chairs, benches, Christmas ornaments, bistro tables, or any other products which now or hereafter at any time during the term of Employee's employment are sold (or under active consideration for sale) by the Company; or

(ii) directly or indirectly hire away or attempt to hire away or otherwise engage any employee, key advisor, or consultant of the Company.

(b) In consideration for the covenants set forth in subsection (a) above, the Company agrees that it shall pay to the Employee the sum of Sixty-Five Thousand ($65,000) U.S. Dollars (the "Non-Competition Payment"). The Company has agreed, as an accommodation to the Employee, to remit the Non-Competition Payment in two (2) equal installments of Thirty-Two Thousand Five Hundred ($32,500) U.S. Dollars, payable on the first and second anniversary dates of this Agreement. Employee acknowledges that the foregoing restriction is reasonable as to duration and scope, and has been bargained for as part of the transaction involving the Company's purchase of assets from TCG and the Company's commitment to provide employment to the Employee upon the terms set forth in this Agreement. Employee expressly affirms that the Non-Competition Payment constitutes fair and adequate consideration for such covenants, notwithstanding that payment may be made in full prior to the date of any termination or expiration of this Agreement. In the event Employee shall violate or challenge the enforceability of the terms of this Section 10, Employee agrees to return to the Company all monies received as her Non-Competition Payment.

11. <u>Assignment of Intellectual Property</u>. Acknowledging that Employee will be involved in the design and development of new products for the Company, Employee hereby irrevocably assigns to the Company her entire right, title and interest in and to all inventions, improvements, discoveries, designs, product ideas, sketches, models, and other works of authorship, whether or not the subject of trademark, patent, industrial design or copyright protection (collectively "Intellectual Property") made, created, developed or reduced to practice by the Employee during the period of her employment with the Company, whether alone or jointly with other persons, and resulting from or arising out of any work performed by the Employee on behalf of the Company or connected with any matter relating or possibly relating to any business in which the Company is involved. The Employee further irrevocably and expressly waives in favour of the Company and its successors and assigns any and all moral rights that she may have in the Intellectual Property. The Employee agrees to promptly disclose to the Company all Intellectual Property and shall cooperate fully with the Company to obtain for the benefit of the Company or its assignees any patents, trademarks, copyrights or industrial design protections thereon, and to execute and deliver to the Company any applications and assignments and any other lawful documents deemed necessary by the Company to carry out the purposes of this Section 11, all without further consideration. In furtherance of the foregoing, the Employee hereby irrevocably designates and appoints the Company and its duly authorized officers and agents as her agent and attorney-in-fact, to act for and in her behalf and stead to execute and file any such application and to do all other lawfully permitted acts to further the prosecution and issuance of trademarks, patents, industrial designs or copyrights or other



analogous protection with the same legal force and effect as if executed by the Employee. This Section 11 shall survive the termination or expiration of this Agreement.

12. Survival of Covenants/Injunctive Relief. The Employee recognizes that the covenants and agreements contained in Sections 9, 10 and 11 above have significant commercial value, are critical to the protection of the Company's Confidential Information, trade secrets, and goodwill, and that the Company would be irreparably damaged, and its investment in the assets of TCG materially impaired, if the Employee was to engage in any violation thereof. Accordingly, the Employee expressly acknowledges that she is voluntarily entering into this Agreement and that the terms and conditions contained herein, including Sections 9, 10 and 11, are fair and reasonable to the Employee in all respects. The Employee hereby further acknowledges that the Company's remedy at law for breach or threat of breach of the provisions of Sections 9, 10 or 11 is inadequate and that the Company shall have the right to seek injunctive relief in the event of any such breach or threatened breach, in addition to any other remedy available to the Company. If any provision of Sections 9, 10 or 11 shall be invalid or unenforceable to any extent or in any application, the parties hereto agree that the remainder of said Sections and of such terms and conditions shall not be affected thereby, and each and every term and condition of said Sections shall be valid and enforced to the fullest extent and in the broadest application provided by law. If the invalidity or unenforceability is due to the unreasonableness of the time or scope or geographic extent of any covenant and restriction, said covenant and restriction shall nevertheless be effective for such period of time or within such scope or geographical area as may be determined to be reasonable by a court of competent jurisdiction. All of said covenants shall survive any expiration or termination of this Agreement in accordance with their terms.

13. Waiver of Breach. The failure of any party at any time or times to require performance of any provision hereof shall in no manner affect that party's right at a later time to enforce the same. No waiver by any party of the breach of any term or covenant contained in this Agreement, whether by conduct or otherwise, in any one or more instances, shall be deemed to be, or construed as, a further or continuing waiver of any such breach, or a waiver of the breach of any other term or covenant contained in this Agreement.

14. Assignment. This Agreement shall be binding upon and inure to the benefit of the Company and its successors and assigns and shall be binding upon the Employee and her heirs, executors and administrators.

15. Impact of Breach by the Company. The Company acknowledges that should it be judicially determined that it (and not the Employee) has materially breached the terms of this Agreement, and that as a result thereof, Employee has been excused of any further performance, the Company shall remain liable to Employee for all amounts that otherwise would be due hereunder as if this Agreement had not been so breached.

16. Right to Suspend. In the event the Company shall assert any claim by way of indemnification against Employee for matters arising under the Asset Purchase Agreement, the Company may suspend payment of the incentive bonus and the Non-Competition Payment in an amount equal to what the Company claims to be due. If it shall be determined that the amount

suspended and claimed to be due is in excess of what is in fact due the Company, the Company agrees to pay interest on the excess amount so withheld from the date of suspension at the same rate at which the Company borrows under its line of credit, and the amount so suspended shall be paid to the party to whom such payment is owed.

17.   Entire Agreement; Amendment.  This Agreement constitutes the entire Agreement among the parties with respect to the subject matter hereof and, unless otherwise provided herein, supersedes all prior agreements or understandings written or oral in respect thereof.  This Agreement may be amended, modified, superseded, canceled, renewed, or extended, and the terms or covenants hereof may be waived, only by a written instrument signed by all the parties hereto, or in the case of a waiver, by the party waiving compliance.

18.   Severability.  If any provision of this Agreement shall be invalid or unenforceable to any extent or in any application, then the remainder of this Agreement and of such term and condition, except to such extent or in such application, shall not be affected thereby, and each and every term and condition of this Agreement shall be valid and enforced to the fullest extent and in the broadest application permitted by law.

19.   Construction and Interpretation.  This Agreement, and all questions arising in connection therewith, shall be governed by and construed in accordance with the laws of the Commonwealth of Massachusetts.  Employee acknowledges that she has been to the offices of the Company in Massachusetts in connection with the negotiation and diligence of the Company's acquisition of the assets of TCG, that she will be required to travel to and/or correspond and communicate regularly with the Company in Massachusetts in the performance of her duties hereunder, that all sales solicited by Employee may be accepted only by the Company at its Massachusetts office, and therefore Employee hereby irrevocably consents to the exclusive jurisdiction of the federal and state courts situated within said Commonwealth for resolution of all disputes arising hereunder.  Employee hereby waives any and all claims as to whether jurisdiction or venue in said Commonwealth is proper.

20.   Headings.  The Section headings contained herein are for convenience and reference only, and shall be given no effect in the interpretation of any term or condition of this Agreement.

[Signatures on next page]

IN WITNESS WHEREOF the parties have executed this Agreement as of the day and year first above written.

OPUS, INC.

By: ______________________
John Stone, President

EMPLOYEE:

______________________
Pamela Campbell

181388.4

EMPLOYMENT AGREEMENT

EMPLOYMENT AGREEMENT made this 3rd day of October, 2003 by and between OPUS, Inc., a Massachusetts corporation with a principal place of business at 24 William Way, P.O. Box 525, Bellingham, MA 02019-0525 (the "Company") and Robert Campbell, an individual residing at 44 Green Acres, Morin Heights, Quebec, Canada J0R 1H0 (the "Employee").

WHEREAS, as of the date hereof the Company has purchased substantially all of the assets of The Company Garden Inc., an Ontario corporation ("TCG"), pursuant to an Asset Purchase Agreement executed by and among the Company, TCG, the Employee, and Pamela Campbell (the "Asset Purchase Agreement");

WHEREAS, as an inducement to entering into the Asset Purchase Agreement and closing on the purchase of assets from TCG, the Company has required and Employee has agreed to enter into an employment agreement upon the terms set forth herein;

NOW, THEREFORE, in consideration of the mutual covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Company and the Employee hereby agree as follows:

1. Employment. The Company hereby agrees to employ the Employee, and the Employee hereby accepts such employment, upon the terms and conditions hereinafter set forth. The Employee represents and warrants to the Company that his employment by the Company and the performance of his duties as contemplated by this Agreement do not and will not violate the terms or conditions of any other agreement or understanding by which the Employee is bound or subject, and that the Employee knows of no basis for any claim that he is so bound or subject.

2. Term. This Agreement shall commence on the date hereof, and shall continue in effect for a term of five (5) years unless earlier terminated as provided in Section 8 hereof.

3. Duties. The Employee's primary responsibilities with the Company shall be in sales with particular emphasis on growing the product line previously introduced by TCG under the Country Nests Nids De Campagne® brand, as such line may hereafter be modified, enhanced and expanded by the Company during the term hereof. Employee shall have such other responsibilities consistent with his general experience and training as may be prescribed by the President of the Company from time to time. Employee acknowledges that his employment by the Company is full-time and that he shall at all times use his best efforts to discharge his duties in furtherance of the Company's interests. The parties hereto affirm that Employee shall discharge his duties hereunder from his home unless a substitute location reasonably proximate to Employee's home is procured and such location is reasonably acceptable to Employee. The Employee agrees that in the course of his performance of duties, he will be required to travel both domestically and internationally as deemed necessary or appropriate by the Company, including without limitation, travel to sales, strategic planning, and product development

meetings conducted by the Company. All pre-approved travel expenditures will be paid by the Company subject to Employee's compliance with travel and expense guidelines utilized by the Company for its sales employees generally.

4.    Salary/Signing Bonus. As compensation for the services to be rendered by the Employee under this Agreement, the Company shall pay to the Employee a salary of Seventy-Five Thousand ($75,000) U.S. Dollars per year (the "Salary"), payable in accordance with the Company's normal payroll policies. In addition to payment of Salary, the Company also agrees to remit to Employee a one-time signing bonus of Forty Thousand ($40,000) U.S. Dollars, payable upon execution of this Agreement. The Company agrees to adjust the signing bonus with a payment on or before January 31, 2004 of an additional Ten Thousand ($10,000) U.S. Dollars if and only if "net sales" by the Company of "Country Nests Products" for the period September 1, 2003 through December 31, 2003 exceeds net sales of Country Nests Products made by TCG for the same quarterly period in 2002. For purposes of this Agreement, (i) "net sales" means gross sales less GST, PST, any and all other sales and excise taxes, returns, allowances, and discounts and (ii) "Country Nests Products" means those products previously sold by TCG under the Country Nests Nids De Campagne® mark, together with all new and substitute products hereafter introduced by the Company for sale under the Country Nests Nids De Campagne® mark. In recognition that the Company will not have closed on its acquisition of TCG assets until after September 1, 2003, the parties agree that sales of Country Nests Products from and after September 1, 2003 shall include sales made by TCG from and after such date through the date of closing.

5.    Incentive Bonus.

(a)    During each year of Employee's employment hereunder, Employee will be entitled to an annual incentive bonus equal to five (5%) percent of the amount by which net sales of "Eligible Products" (as measured in U.S. Dollars for the twelve (12) months ending on the day preceding each anniversary date of this Agreement) exceeds the "Applicable Base Amount". For purposes hereof, the initial Applicable Base Amount shall be One Million Sixty Two Thousand One Hundred Forty-Three ($1,062,143) U.S. Dollars, such amount representing net sales by TCG (as converted to U.S. Dollars) for the year ended July, 31, 2003. Commencing with the second and all successive years of the term of this Agreement, the Applicable Base Amount shall be the greater of (i) One Million Sixty Two Thousand One Hundred Forty-Three ($1,062,143) U.S. Dollars or (ii) the highest level of net sales of Eligible Products achieved for any twelve (12) month period ending on the day prior to an anniversary date of this Agreement. As used in this Agreement, the term "Eligible Products" means products now and hereafter sold by the Company and its parent, Opus, Inc., under the Country Nests Nids De Campagne® brand.

*For illustrative purposes only, assume this Agreement is executed September 30, 2003 and that net sales of Eligible Products are $1.3M and $1.7M for the twelve months ended on September 29, 2004 and September 29, 2005 respectively. The incentive bonus for the first employment year ended September 29, 2004 would be determined as follows: ($1,300,000 - $1,062,143) x 5% = $11,892.85. The incentive bonus for the second employment year ended September 29, 2005 would be ($1,700,000 - $1,300,000) x 5% = $20,000.*

(b) All incentive bonuses will be paid within forty-five (45) days of the close of each anniversary date of this Agreement. The Company agrees that it will increase the amount of the incentive bonus to six (6%) percent for any employment year in which the Company's gross margin for sales of Eligible Products equals or exceeds 45.2%. The term "gross margin" means net sales less cost of product, agent commissions, duty, freight, and broker fees. The Company agrees to include a statement of calculation of gross margin with each remittance of incentive bonus earned hereunder.

(c) The parties hereto acknowledge that in the event the Company should sell all or substantially all of its assets and the purchaser thereof shall refuse either to assume this Agreement or assume the incentive bonus obligations owed to Employee under this Section 5, Employee will forfeit his valuable right to earn the bonus amounts provided in this Section 5. Accordingly, the Company agrees that upon the occurrence of any such event, Employee shall be deemed to have earned a one-time fixed payment in lieu of the incentive bonus in the amount stated below:

| Date of Sale | Amount Earned |
|---|---|
| Prior to 2nd anniversary of this Agreement | $75,000 |
| Between 2nd and 3rd anniversary of Agreement | $50,000 |
| Between 3rd and 4th anniversary of Agreement | $40,000 |
| Between 4th and 5th anniversary of Agreement | $20,000 |

The Company agrees to remit the amount so earned within ten (10) days following closing of any such sale. Notwithstanding the foregoing, should a purchaser offer employment to Employee at a comparable base salary with an incentive bonus substantially comparable to that stated in subsection (a) above, and such employment is refused by Employee, the Company shall be relieved of its obligation to remit any fixed payment to Employee under this subsection (c) and Employee shall be deemed to have forfeited his right to receive any payment under this subsection.

6. Reimbursement of Business Expenses. The Company agrees to reimburse the Employee for all reasonable out-of-pocket expenses incurred in connection with Company business in accordance with the policies of the Company, as those policies may be amended or modified from time to time. Reimbursable expenses include, without limitation, authorized travel, cell phone, office and business supplies.

7. Vacation/Benefits.

(a) The Employee shall be entitled to four (4) weeks paid vacation per year.

(b) The Company shall provide the Employee with dental and prescription coverage comparable to benefits historically provided to Employee by TCG.

(c) In lieu of an automobile allowance, the Company shall reimburse the Employee (or TCG) for the lease payment associated with a 2000 Toyota Tundra, (which vehicle is under

lease with TCG), for the remaining term of said lease. Said vehicle shall be used by Employee primarily for business purposes only. The Company also agrees to reimburse the Employee (or TCG) for all insurance, registration, service, repair, and fuel (for business use only) and any and all other expenses associated with the operation and maintenance of such vehicle. Upon conclusion of the lease, the Company agrees to absorb any excess mileage charges. Upon lease expiration, the Company will thereafter provide Employee with an automobile allowance in the amount of Three Hundred Fifty ($350) U.S. Dollars per month during the remainder of the term of this Agreement. If an allowance is provided to Employee, the Employee understands that he shall be responsible for all insurance, registration, service, repairs, fuel (subject to mileage reimbursement for business use), and any and all other expenses associated with the operation and maintenance of such vehicle.

8. Termination.

(a) This Agreement shall terminate immediately in the event of the Employee's death. Should the Employee become physically or mentally disabled or ill to the extent that he is unable to substantially perform his duties hereunder to the reasonable satisfaction of the President of the Company (i) for a period of ninety (90) consecutive days, or (ii) for shorter periods aggregating ninety (90) days during any period of three hundred sixty-five (365) consecutive calendar days, the Company may, at its option, elect to terminate the Employee's employment at any time thereafter while such disability or illness continues by giving written notice thereof to the Employee. If the Company believes Employee to be physically or mentally incapable of performing the services required of him hereunder, the Company may require Employee to be examined by a physician selected by it to verify or to determine the extent of such disability and such physician's determination, as certified to the Company, as to whether Employee is or is not capable of performing the services required of him hereunder, shall be binding and conclusive. In the event Employee's employment hereunder shall terminate on account of death or disability, the Company agrees that it will continue to pay to the Employee (or his estate following death), as a death or disability benefit, the incentive bonus referenced in Section 5 above to the extent earned during the balance of the term, as fully as if Employee's employment had not in fact terminated on account of death or disability. In addition, should Employee's employment hereunder terminate on account of death or disability prior to the date that Employee has received payment in full for his non-competition and non-solicitation covenants set forth in Section 10 hereof, the Company hereby agrees that it will pay the remaining amounts due in consideration of such covenants as a death benefit and/or as a separation/disability benefit at the time(s) set forth in said Section 10 for payment thereof.

(b) In addition to termination on account of death or disability, the Company may, upon written notice to the Employee, terminate the Employee's employment under this Agreement for just cause. As used herein, "just cause" shall mean the Employee has engaged in: (i) willful and substantial misconduct with respect to the business and affairs of the Company; (ii) gross neglect of duties, dishonesty, deliberate disregard of any material rule or policy of the Company, or the commission by the Employee of any other action with intent to injure the Company; (iii) commission of an act involving larceny, embezzlement, or conversion, or any act involving the misappropriation of Company funds; (iv) any activity resulting in a conviction for any crime pertaining or relating to the Company; (v) repeated failure to be present

at work during normal business hours; (vi) violation of an express directive or any rule or regulation established by the President of the Company, which violation continues uncured for ten (10) days after written notice thereof has been given to the Employee (provided that Employee shall not have the right to cure successive violations of the same or similar directive); (vii) abuse of alcohol or other drugs; (viii) violation of the confidentiality, non-competition, or non-solicitation covenants set forth herein, or (ix) the material breach of any other covenant, condition or agreement contained in this Agreement or in the Asset Purchase Agreement. In addition to the foregoing, Employee understands that his employment is linked to the employment by the Company of his wife, Pamela Campbell. Should the Company terminate Pamela Campbell's employment for just cause under the terms of her employment agreement, Employee acknowledges that his continued employment with the Company would create a difficult and unacceptable situation for the Company constituting just cause for the Company to terminate Employee hereunder. In the event Employee shall be terminated for just cause, Employee shall be entitled to receive all compensation then due and owing together with any incentive bonus previously earned and unpaid as of the date of such termination.

9. Confidentiality.

The Employee hereby acknowledges that during the term of his employment hereunder, he will have access to confidential information of the Company, including marketing strategies, concepts, product designs, names of suppliers, customers, channel partners, manufacturers, and key employees, inventions, branding strategies, sales, cost and select financial information, and all information which prior to the date of acquisition of the assets of TCG by the Company was properly regarded as confidential and proprietary by TCG (collectively, "Confidential Information"). During the term of Employee's employment and at any time thereafter, Employee agrees that he shall not divulge or cause to be divulged, communicate or cause to be communicated, publish or cause to be published, or otherwise disclose or cause to be disclosed to any person, firm, corporation, association, or entity, any of the Confidential Information except as required to discharge his employment responsibilities hereunder. For purposes hereof, Confidential Information shall not include information which (a) at the time of disclosure to Employee was generally known to the relevant trade so as to no longer be a protectable trade secret, or (b) was lawfully received by Employee from a third party who independently, without prompting or assistance by Employee, developed or acquired such Confidential Information free of any obligation, express or implied, to the Company with respect thereto.

10. Non-Competition and Non-Solicitation.

(a) The Employee hereby acknowledges that the Company would not have entered into the Asset Purchase Agreement to purchase the assets of TCG or entered into this Agreement in the absence of Employee's covenants set forth in this Section 10. In furtherance thereof, Employee understands that the Company's success in operating and expanding the business previously conducted by TCG is highly dependent on maintaining customer, vendor, and manufacturing relationships and the goodwill associated therewith. Accordingly, in order to protect the goodwill of the Company and all Confidential Information, Employee hereby agrees

that during the term of his employment by the Company and for a period of two (2) years following any termination or expiration thereof, Employee will not:

(i) directly or indirectly, either as an individual for Employee's own account, or as a partner or joint venturer, or as an advisor, consultant, representative, employee, officer, director, or shareholder of any corporation or other business entity, or in any other capacity, engage in, enter into or participate in any way in any enterprise that is involved in the development, manufacture, distribution, or sale within the United States or Canada of bird feeders, bird houses, knewel posts, candles, watering cans, Adirondack chairs, benches, Christmas ornaments, bistro tables, or any other products which now or hereafter at any time during the term of Employee's employment are sold (or under active consideration for sale) by the Company; or

(ii) directly or indirectly hire away or attempt to hire away or otherwise engage any employee, key advisor, or consultant of the Company.

(b) In consideration for the covenants set forth in subsection (a) above, the Company agrees that it shall pay to the Employee the sum of Sixty-Five Thousand ($65,000) U.S. Dollars (the "Non-Competition Payment"). The Company has agreed, as an accommodation to the Employee, to remit the Non-Competition Payment in two (2) equal installments of Thirty-Two Thousand Five Hundred ($32,500) U.S. Dollars, payable on the first and second anniversary dates of this Agreement. Employee acknowledges that the foregoing restriction is reasonable as to duration and scope, and has been bargained for as part of the transaction involving the Company's purchase of assets from TCG and the Company's commitment to provide employment to the Employee upon the terms set forth in this Agreement. Employee expressly affirms that the Non-Competition Payment constitutes fair and adequate consideration for such covenants, notwithstanding that payment may be made in full prior to the date of any termination or expiration of this Agreement. In the event Employee shall violate or challenge the enforceability of the terms of this Section 10, Employee agrees to return to the Company all monies received as his Non-Competition Payment.

11. Assignment of Intellectual Property. Acknowledging that Employee will be involved in the design and development of new products for the Company, Employee hereby irrevocably assigns to the Company his entire right, title and interest in and to all inventions, improvements, discoveries, designs, product ideas, sketches, models, and other works of authorship, whether or not the subject of trademark, patent, industrial design or copyright protection (collectively "Intellectual Property") made, created, developed or reduced to practice by the Employee during the period of his employment with the Company, whether alone or jointly with other persons, and resulting from or arising out of any work performed by the Employee on behalf of the Company or connected with any matter relating or possibly relating to any business in which the Company is involved. The Employee further irrevocably and expressly waives in favour of the Company and its successors and assigns any and all moral rights that he may have in the Intellectual Property. The Employee agrees to promptly disclose to the Company all Intellectual Property and shall cooperate fully with the Company to obtain

for the benefit of the Company or its assignees any patents, trademarks, copyrights or industrial design protections thereon, and to execute and deliver to the Company any applications and assignments and any other lawful documents deemed necessary by the Company to carry out the purposes of this Section 11, all without further consideration. In furtherance of the foregoing, the Employee hereby irrevocably designates and appoints the Company and its duly authorized officers and agents as his agent and attorney-in-fact, to act for and in his behalf and stead to execute and file any such application and to do all other lawfully permitted acts to further the prosecution and issuance of trademarks, patents, industrial designs or copyrights or other analogous protection with the same legal force and effect as if executed by the Employee. This Section 11 shall survive the termination or expiration of this Agreement.

12. Survival of Covenants/Injunctive Relief. The Employee recognizes that the covenants and agreements contained in Sections 9, 10 and 11 above have significant commercial value, are critical to the protection of the Company's Confidential Information, trade secrets, and goodwill, and that the Company would be irreparably damaged, and its investment in the assets of TCG materially impaired, if the Employee was to engage in any violation thereof. Accordingly, the Employee expressly acknowledges that he is voluntarily entering into this Agreement and that the terms and conditions contained herein, including Sections 9, 10 and 11, are fair and reasonable to the Employee in all respects. The Employee hereby further acknowledges that the Company's remedy at law for breach or threat of breach of the provisions of Sections 9, 10 or 11 is inadequate and that the Company shall have the right to seek injunctive relief in the event of any such breach or threatened breach, in addition to any other remedy available to the Company. If any provision of Sections 9, 10 or 11 shall be invalid or unenforceable to any extent or in any application, the parties hereto agree that the remainder of said Sections and of such terms and conditions shall not be affected thereby, and each and every term and condition of said Sections shall be valid and enforced to the fullest extent and in the broadest application provided by law. If the invalidity or unenforceability is due to the unreasonableness of the time or scope or geographic extent of any covenant and restriction, said covenant and restriction shall nevertheless be effective for such period of time or within such scope or geographical area as may be determined to be reasonable by a court of competent jurisdiction. All of said covenants shall survive any expiration or termination of this Agreement in accordance with their terms.

13. Waiver of Breach. The failure of any party at any time or times to require performance of any provision hereof shall in no manner affect that party's right at a later time to enforce the same. No waiver by any party of the breach of any term or covenant contained in this Agreement, whether by conduct or otherwise, in any one or more instances, shall be deemed to be, or construed as, a further or continuing waiver of any such breach, or a waiver of the breach of any other term or covenant contained in this Agreement.

14. Assignment. This Agreement shall be binding upon and inure to the benefit of the Company and its successors and assigns and shall be binding upon the Employee and his heirs, executors and administrators.

15. Impact of Breach by the Company. The Company acknowledges that should it be judicially determined that it (and not the Employee) has materially breached the terms of this

Agreement, and that as a result thereof, Employee has been excused of any further performance, the Company shall remain liable to Employee for all amounts that otherwise would be due hereunder as if this Agreement had not been so breached.

16. Right to Suspend. In the event the Company shall assert any claim by way of indemnification against Employee for matters arising under the Asset Purchase Agreement, the Company may suspend payment of the incentive bonus and/or the Non-Competition Payment in an amount equal to what the Company claims to be due. If it shall be determined that the amount suspended and claimed to be due is in excess of what is in fact due the Company, the Company agrees to pay interest on the excess amount so withheld from the date of suspension at the same rate at which the Company borrows under its line of credit, and the amount so suspended shall be paid to the party to whom such payment is owed.

17. Entire Agreement; Amendment. This Agreement constitutes the entire Agreement among the parties with respect to the subject matter hereof and, unless otherwise provided herein, supersedes all prior agreements or understandings written or oral in respect thereof. This Agreement may be amended, modified, superseded, canceled, renewed, or extended, and the terms or covenants hereof may be waived, only by a written instrument signed by all the parties hereto, or in the case of a waiver, by the party waiving compliance.

18. Severability. If any provision of this Agreement shall be invalid or unenforceable to any extent or in any application, then the remainder of this Agreement and of such term and condition, except to such extent or in such application, shall not be affected thereby, and each and every term and condition of this Agreement shall be valid and enforced to the fullest extent and in the broadest application permitted by law.

19. Construction and Interpretation. This Agreement, and all questions arising in connection therewith, shall be governed by and construed in accordance with the laws of the Commonwealth of Massachusetts. Employee acknowledges that he has been to the offices of the Company in Massachusetts in connection with the negotiation and diligence of the Company's acquisition of the assets of TCG, that he will be required to travel to and/or correspond and communicate regularly with the Company in Massachusetts in the performance of his duties hereunder, that all sales solicited by Employee may be accepted only by the Company at its Massachusetts office, and therefore Employee hereby irrevocably consents to the exclusive jurisdiction of the federal and state courts situated within said Commonwealth for resolution of all disputes arising hereunder. Employee hereby waives any and all claims as to whether jurisdiction or venue in said Commonwealth is proper.

20. Headings. The Section headings contained herein are for convenience and reference only, and shall be given no effect in the interpretation of any term or condition of this Agreement.

[Signatures on next page]

IN WITNESS WHEREOF the parties have executed this Agreement as of the day and year first above written.

OPUS, INC.

By: ______________________
John Stone, President

EMPLOYEE:

______________________
Robert Campbell

182283.4

C

OPUS
24 William Way
PO Box 525
Bellingham MA
02019-0525
508.966.0470 tel
508.966.3182 fax

August 12, 2005

Pamela Campbell
44 Green Acres
Morin Heights, Quebec
Canada J0R 1H0

Dear Pam,

This letter represents formal notice that your employment with Opus is being terminated for "just cause" pursuant to Section 8(b) of your employment agreement. Termination is effective Monday, August 15, 2005.

Under the terms of your employment agreement with Opus, you are required to work full-time and at all times use your best efforts to further Opus' business interests. While your contract does not provide express sales quotas, it is quite clear that based on your performance to date, there has been a marked lack of effort and commitment in soliciting gift business throughout Canada.

Last fall, you were given a 15 month quota of $100,000 and to date (10 months) your performance has come up short of this goal by more than $52,000. We have long suspected that these results reflect a less than full-time effort on your part. This position is borne out by the meager activity level evident in your e-mail report to Andy on August 2. Your e-mail primarily reports difficulties which independent representatives have communicated to you from the field. The description of July activities reveals little, if any, direct participation on your part in terms of visiting sales reps, making appointments with customers, or otherwise inserting yourself into the sales process to assist in the generation of business for Opus in the gift category. Direct participation is an essential part of your sales responsibilities.

The fact that Opus agreed to let you discharge your responsibilities from home was never intended to mean that you could work when and if you felt like it. There is no way your performance to date or your own report of activity in July is consistent with a full-time effort. In Opus' judgment, you have not acted diligently in the performance of your duties.

Nancy Drake will be contacting you shortly to arrange for the return of all company materials. Opus will remit payment to you for all amounts due through the August 15 termination date, as well as other amounts, if any, deemed payable under applicable law.

Bringing Nature Home

If you have questions or wish to discuss this matter further, have your counsel contact our lawyer, Barry Gold, @ 617-482-8200.

Sincerely,

Michael J. Reilly
President/COO



D

OPUS
24 William Way
PO Box 525
Bellingham MA
02019-0525
508.966.0470 tel
508 966.3182 fax

August 12, 2005

Robert Campbell
44 Green Acres
Morin Heights, Quebec
Canada J0R 1H0

Dear Bob:

As you presumably know, Opus has terminated the employment of your wife Pam for "just cause" under Section 8(b) of her employment agreement. Section 8(b) of your employment agreement provides that termination of your spouse with just cause also constitutes grounds for termination of your employment. Accordingly, this letter serves as confirmation that effective August 15, 2005, your employment with Opus has terminated.

Opus' decision to terminate your employment for the reason stated above should not be construed as any admission that you have acted diligently in the performance of your job responsibilities or that Opus does not have separate and independent grounds to terminate your employment for "just cause" under your employment agreement.

Nancy Drake will be contacting you shortly to arrange for the return of all company materials. Opus will remit payment to you for all amounts due through August 15, as well as other amounts, if any, deemed payable under applicable law. If you have any questions or wish to discuss this matter further, have your counsel contact our lawyer, Barry Gold @ 617-482-8200.

Sincerely,

Michael J. Reilly
President/COO

Bringing Nature Home



E

Zavie Levine
Téléphone : (514) 939-3355 poste 41
Télécopieur : (514) 939-3356
Courriel : zlevine@levinefrishman.com

August 17th, 2005

**WITHOUT PREJUDICE**
**VIA TELECOPIER: (508) 966-3182**
**ORIGINAL TO FOLLOW BY MAIL**

**OPUS, Inc.**
24 William Way
BELLINGHAM (MA)
02019-0525 U.S.A.

**Attention: Mr. Michel J. Reilly**

**RE: Robert & Pam Campbell**
**-vs- Opus, Inc.**
**Our file: CA-003-05**

Dear Mr. Reilly:

We have been engaged by both Pamela Campbell and Robert Campbell to communicate with you with regard to your letters of August 12th, 2005, terminating the services of our clients with Opus.

You take the position that Mrs. Campbell was terminated for "just cause", as per Section 8(b) of the Employment Agreement.

We have read the said article and cannot find any reasoning in your letter that would give rise to a termination for "just cause".

Moreover, if you were dissatisfied with the services rendered by Mrs. Campbell, a senior employee of your Canadian operation, you would certainly be required to provide her with a written notice as to why you were dissatisfied with her performance and give her an opportunity to remedy any alleged default.

For the record, our client denies emphatically that she is directly responsible for the paucity of Opus' sales made by her team of sales representatives across Canada.

LEVINE FRISHMAN

On many occasions our clients advised Andy Schleifstein that there were valid reasons for the lack of sales in Canada.

Opus has its own existing sales force in Canada, which sells to both the majors, chains and the distributors who have their own networks across the country.

As a result, the sales agents that report to our clients cannot sell to these customers. This leaves the "Ma" and "Pa" stores across the country, most of whom are also solicited by your distributors so are off limits to our clients' sales representatives.

For example, in the Province of Ontario, *"Wild Bird Trading"* is a distributor that sells Opus products across that Province and has contacted virtually all proposed customers. Our clients' sales agents cannot deal with these outlets.

This is unfortunate because what is left to our clients sales representatives are customers that either cannot afford to pay the expensive freight charges or, are not credit-worthy.

Moreover, the refusal of Opus to attend any trade shows in Canada has not been helpful.

It is interesting to note that Mr. Stone recently advised Mr. Bob Campbell that the purchase by Opus of our clients' business was a huge mistake because the products developed by our clients do not translate to the mass market which you had anticipated.

In furtherance of the negative attitude that your company has developed against our clients, Mrs. Campbell, who is in charge of sales, was not invited to any sales meetings in the U.S. nor, was Mr. Bob Campbell, who is in charge of new product development in Canada invited to new product meetings in the U.S.

It is evident that once you have made a determination that the products do not translate well to the nature of the market to which you cater, you have decided to find any reason whatsoever to terminate the obligations that you have towards our clients in virtue of the Employment Agreements dated October 3rd, 2003.

If you consider that you made a bad deal with our clients, our clients should not suffer prejudice. You have encountered obligations to our clients, which we expect to be honoured in full.

LEVINE FRISHMAN

In our view, your reasons for terminating the agreements are invalid and will be contested in a Court of law, if necessary.

In addition, as our clients were fired for "no just cause", if this matter is not resolved amicably, they intend to file claims with the Quebec Labour Standard Commission alleging a dismissal for "no just cause". In virtue of Article 124 of that law, should the Labour Commissioner agree with our position, he/she would have no other recourse but to order them back to their jobs, together with all back-pay and damages.

This letter shall serve as formal notification that our clients tender their services to your company and are prepared to fulfill all their obligations under the Employment Agreements.

Should this be unacceptable to yourselves and you do not confirm that the August 12th letters of termination are cancelled, and this, in writing, by August 24th, 2005, you would leave us no alternative but to institute proceedings against yourselves for the balance owing to our clients under their Employment Agreements.

According to our clients, as the Employment Agreements run from August 15th to October 1st, 2008, a period of 37 ½ months, their claims would be as follows:

| | | |
|---|---|---|
| (i) | base salary of $75,000.00 U.S. per annum each, our clients would be entitled to ($12,500.00 x 37.5): | $468,750.00 |
| (ii) | cell phone, fax, medical insurance and internet service, would be calculated to be worth an additional $350.00 U.S. per month ($350.00 x 37.5): | $ 13,125.00 |
| (iii) | car allowance of $350.00 U.S. per month each ($700.00 x 37.5): | $ 26,250.00 |
| (iv) | our clients are each entitled to $32,500.00 U.S. on October 4th, 2005, as the balance owing under the non-compete clause: | $ 65,000.00 |
| **TOTAL:** | | **$573,125.00 U.S.** |

LEVINE FRISHMAN

We are of the opinion that proceedings can be instituted in Quebec to enforce our clients rights under the Employment Agreements, notwithstanding paragraph 19 of the contract.

We trust that we shall have your positive response by August 24th, 2005, revoking the letters of August 12th, 2005.

**Yours very truly,**

**LEVINE FRISHMAN**

**Per: ZAVIE LEVINE**
**/mp**

(TO PLAINTIFF'S ATTORNEY: PLEASE CIRCLE TYPE OF ACTION INVOLVED:- TORT - MOTOR VEHICLE TORT - CONTRACT - EQUITABLE RELIEF - OTHER.)

COMMONWEALTH OF MASSACHUSETTS

NORFOLK, ss.

SUPERIOR COURT
CIVIL ACTION

NO. NOCV2005-01456

Opus, Inc.
........................................................, *Plaintiff(s)*

v.

Pamela Campbell and
Robert Campbell
........................................................, *Defendant(s)*

8/24/05 2:30

## SUMMONS

To the above-named Defendant: Robert Campbell

You are hereby summoned and required to serve upon Michael R. Bernardo, plaintiff's attorney, whose address is Ten Post Office Square Boston, MA 02109, an answer to the complaint which is herewith served upon you, within 20 days after service of this summons upon you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint. You are also required to file your answer to the complaint in the office of the Clerk of this court at Dedham either before service upon plaintiff's attorney or within a reasonable time thereafter.

Unless otherwise provided by Rule 13(a), your answer must state as a counterclaim any claim which you may have against the plaintiff which arises out of the transaction or occurrence that is the subject matter of the plaintiff's claim or you will thereafter be barred from making such claim in any other action.

WITNESS, SUZANNE V. DELVECCHIO, *Esquire*, at Boston the 23rd day of August, in the year of our Lord two thousand and five

Walter F. Timilty *Clerk.*

NOTES:

1. This summons is issued pursuant to Rule 4 of the Massachusetts Rules of Civil Procedure.
2. When more than one defendant is involved, the names of all defendants should appear in the caption. If a separate summons is used for each defendant, each should be addressed to the particular defendant.

F-33

05 CA 11843 NMG

JS 44 (Rev. 11/04)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

**I. (a) PLAINTIFFS**

Opus, Inc.

**DEFENDANTS**

Campbell, Pamela
Campbell, Robert

(b) County of Residence of First Listed Plaintiff: Norfolk
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant: Quebec, Canada
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

(c) Attorney's (Firm Name, Address, and Telephone Number): Thomas J. Gallitano, Conn, Kavanaugh, 10 Post Office Sq., Boston, MA 617-482-3200

Attorneys (If Known): Richard J. Rosensweig, Goulston & Storrs, 400 Atlantic Ave., Boston, MA 02110 - 617-482-1776

**II. BASIS OF JURISDICTION** (Place an "X" in One Box Only)

- ☐ 1 U.S. Government Plaintiff
- ☐ 3 Federal Question (U.S. Government Not a Party)
- ☐ 2 U.S. Government Defendant
- ☒ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** (Place an "X" in One Box for Plaintiff and One Box for Defendant) (For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☒ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☒ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. NATURE OF SUIT** (Place an "X" in One Box Only)

**CONTRACT**
- ☐ 110 Insurance
- ☐ 120 Marine
- ☐ 130 Miller Act
- ☐ 140 Negotiable Instrument
- ☐ 150 Recovery of Overpayment & Enforcement of Judgment
- ☐ 151 Medicare Act
- ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans)
- ☐ 153 Recovery of Overpayment of Veteran's Benefits
- ☐ 160 Stockholders' Suits
- ☒ 190 Other Contract
- ☐ 195 Contract Product Liability
- ☐ 196 Franchise

**REAL PROPERTY**
- ☐ 210 Land Condemnation
- ☐ 220 Foreclosure
- ☐ 230 Rent Lease & Ejectment
- ☐ 240 Torts to Land
- ☐ 245 Tort Product Liability
- ☐ 290 All Other Real Property

**TORTS**

PERSONAL INJURY
- ☐ 310 Airplane
- ☐ 315 Airplane Product Liability
- ☐ 320 Assault, Libel & Slander
- ☐ 330 Federal Employers' Liability
- ☐ 340 Marine
- ☐ 345 Marine Product Liability
- ☐ 350 Motor Vehicle
- ☐ 355 Motor Vehicle Product Liability
- ☐ 360 Other Personal Injury

PERSONAL INJURY
- ☐ 362 Personal Injury - Med. Malpractice
- ☐ 365 Personal Injury - Product Liability
- ☐ 368 Asbestos Personal Injury Product Liability

PERSONAL PROPERTY
- ☐ 370 Other Fraud
- ☐ 371 Truth in Lending
- ☐ 380 Other Personal Property Damage
- ☐ 385 Property Damage Product Liability

**CIVIL RIGHTS**
- ☐ 441 Voting
- ☐ 442 Employment
- ☐ 443 Housing/ Accommodations
- ☐ 444 Welfare
- ☐ 445 Amer. w/Disabilities - Employment
- ☐ 446 Amer. w/Disabilities - Other
- ☐ 440 Other Civil Rights

**PRISONER PETITIONS**
- ☐ 510 Motions to Vacate Sentence

Habeas Corpus:
- ☐ 530 General
- ☐ 535 Death Penalty
- ☐ 540 Mandamus & Other
- ☐ 550 Civil Rights
- ☐ 555 Prison Condition

**FORFEITURE/PENALTY**
- ☐ 610 Agriculture
- ☐ 620 Other Food & Drug
- ☐ 625 Drug Related Seizure of Property 21 USC 881
- ☐ 630 Liquor Laws
- ☐ 640 R.R. & Truck
- ☐ 650 Airline Regs.
- ☐ 660 Occupational Safety/Health
- ☐ 690 Other

**LABOR**
- ☐ 710 Fair Labor Standards Act
- ☐ 720 Labor/Mgmt. Relations
- ☐ 730 Labor/Mgmt.Reporting & Disclosure Act
- ☐ 740 Railway Labor Act
- ☐ 790 Other Labor Litigation
- ☐ 791 Empl. Ret. Inc. Security Act

**BANKRUPTCY**
- ☐ 422 Appeal 28 USC 158
- ☐ 423 Withdrawal 28 USC 157

**PROPERTY RIGHTS**
- ☐ 820 Copyrights
- ☐ 830 Patent
- ☐ 840 Trademark

**SOCIAL SECURITY**
- ☐ 861 HIA (1395ff)
- ☐ 862 Black Lung (923)
- ☐ 863 DIWC/DIWW (405(g))
- ☐ 864 SSID Title XVI
- ☐ 865 RSI (405(g))

**FEDERAL TAX SUITS**
- ☐ 870 Taxes (U.S. Plaintiff or Defendant)
- ☐ 871 IRS—Third Party 26 USC 7609

**OTHER STATUTES**
- ☐ 400 State Reapportionment
- ☐ 410 Antitrust
- ☐ 430 Banks and Banking
- ☐ 450 Commerce
- ☐ 460 Deportation
- ☐ 470 Racketeer Influenced and Corrupt Organizations
- ☐ 480 Consumer Credit
- ☐ 490 Cable/Sat TV
- ☐ 810 Selective Service
- ☐ 850 Securities/Commodities/ Exchange
- ☐ 875 Customer Challenge 12 USC 3410
- ☐ 890 Other Statutory Actions
- ☐ 891 Agricultural Acts
- ☐ 892 Economic Stabilization Act
- ☐ 893 Environmental Matters
- ☐ 894 Energy Allocation Act
- ☐ 895 Freedom of Information Act
- ☐ 900Appeal of Fee Determination Under Equal Access to Justice
- ☐ 950 Constitutionality of State Statutes

**V. ORIGIN** (Place an "X" in One Box Only)

- ☐ 1 Original Proceeding
- ☒ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from another district (specify)
- ☐ 6 Multidistrict Litigation
- ☐ 7 Appeal to District Judge from Magistrate Judgment

**VI. CAUSE OF ACTION**

Cite the U.S. Civil Statute under which you are filing (**Do not cite jurisdictional statutes unless diversity**): 28 U.S.C. Section 1332

Brief description of cause: Damages and unjust enrichment relating to breach of employment agreements

**VII. REQUESTED IN COMPLAINT:** ☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $ Unspecified

CHECK YES only if demanded in complaint: JURY DEMAND: ☒ Yes ☐ No

**VIII. RELATED CASE(S) IF ANY** (See instructions): JUDGE ______ DOCKET NUMBER ______

DATE: 9/12/05

SIGNATURE OF ATTORNEY OF RECORD: [signature]

**FOR OFFICE USE ONLY**

RECEIPT # ______ AMOUNT ______ APPLYING IFP ______ JUDGE ______ MAG. JUDGE ______

DISTRICT OF MASSACHUSETTS

1. TITLE OF CASE (NAME OF FIRST PARTY ON EACH SIDE ONLY)______________________

2. CATEGORY IN WHICH THE CASE BELONGS BASED UPON THE NUMBERED NATURE OF SUIT CODE LISTED ON THE CIVIL COVER SHEET. (SEE LOCAL RULE 40.1(A)(1)).

___ I. 160, 410, 470, R.23, REGARDLESS OF NATURE OF SUIT.

___ II. 195, 368, 400, 440, 441-444, 540, 550, 555, 625, 710, 720, 730, 740, 790, 791, 820*, 830*, 840*, 850, 890, 892-894, 895, 950.

*Also complete AO 120 or AO 121 for patent, trademark or copyright cases

_X_ III. 110, 120, 130, 140, 151, 190, 210, 230, 240, 245, 290, 310, 315, 320, 330, 340, 345, 350, 355, 360, 362, 365, 370, 371, 380, 385, 450, 891.

___ IV. 220, 422, 423, 430, 460, 510, 530, 610, 620, 630, 640, 650, 660, 690, 810, 861-865, 870, 871, 875, 900.

___ V. 150, 152, 153.

05 CA 11843 NMG

3. TITLE AND NUMBER, IF ANY, OF RELATED CASES. (SEE LOCAL RULE 40.1(E)).

4. HAS A PRIOR ACTION BETWEEN THE SAME PARTIES AND BASED ON THE SAME CLAIM EVER BEEN FILED IN THIS COURT? YES ☐ NO ☒

5. DOES THE COMPLAINT IN THIS CASE QUESTION THE CONSTITUTIONALITY OF AN ACT OF CONGRESS AFFECTING THE PUBLIC INTEREST? (SEE 28 USC 2403) YES ☐ NO ☒

IF SO, IS THE U.S.A. OR AN OFFICER, AGENT OR EMPLOYEE OF THE U.S. A PARTY? YES ☐ NO ☐

6. IS THIS CASE REQUIRED TO BE HEARD AND DETERMINED BY A DISTRICT COURT OF THREE JUDGES PURSUANT TO TITLE 28 USC 2284? YES ☐ NO ☒

7. DO ALL PARTIES IN THIS ACTION RESIDE IN THE CENTRAL SECTION OF THE DISTRICT OF MASSACHUSETTS (WORCESTER COUNTY) - (SEE LOCAL RULE 40.1(C)). YES ☐ NO ☒

OR IN THE WESTERN SECTION (BERKSHIRE, FRANKLIN, HAMPDEN OR HAMPSHIRE COUNTIES)? - (SEE LOCAL RULE 40.1(D)). YES ☐ NO ☐

8. DO ALL OF THE PARTIES RESIDING IN MASSACHUSETTS RESIDE IN THE CENTRAL AND/OR WESTERN SECTIONS OF THE DISTRICT? YES ☐ NO ☒

(a) IF YES, IN WHICH SECTION DOES THE PLAINTIFF RESIDE?______________________

9. IN WHICH SECTION DO THE ONLY PARTIES RESIDING IN MASSACHUSETTS RESIDE? Eastern

10. IF ANY OF THE PARTIES ARE THE UNITED STATES, COMMONWEALTH OF MASSACHUSETTS, OR ANY GOVERNMENTAL AGENCY OF THE U.S.A. OR THE COMMONWEALTH, DO ALL OTHER PARTIES RESIDE IN THE CENTRAL SECTION: YES ☐ NO ☐ OR WESTERN SECTION; YES ☐ NO ☐

(PLEASE TYPE OR PRINT)

ATTORNEY'S NAME Richard J. Rosensweig

ADDRESS Goulston & Storrs -400 Atlantic Avenue, Boston, MA 02110

TELEPHONE NO. 617-482-1776

(Categfrm.rev - 3/97)