MASXP-20050621
kramercy

**Commonwealth of Massachusetts**
**NORFOLK SUPERIOR COURT**
**Case Summary**
**Civil Docket**

09/14/2005
09:42 AM

# NOCV2005-01456
## Opus Inc v Campbell et al

| | | | | | | |
|---|---|---|---|---|---|---|
| **File Date** | 08/23/2005 | **Status** | Disposed: transfered to other court (dtrans) | | | |
| **Status Date** | 09/14/2005 | **Session** | B - Civil B-CtRm 3 | | | |
| **Origin** | 1 | **Case Type** | D13 - Declaratory judgement (231A) | | | |
| **Lead Case** | | **Track** | A | | | |
| **Service** | 11/21/2005 | **Answer** | 01/20/2006 | **Rule12/19/20** | 01/20/2006 | |
| **Rule 15** | 11/16/2006 | **Discovery** | 10/12/2007 | **Rule 56** | 12/11/2007 | |
| **Final PTC** | 04/09/2008 | **Disposition** | 08/22/2008 | **Jury Trial** | Yes | |

### PARTIES

**Plaintiff**
Opus Inc
Active 08/23/2005

**Private Counsel 550745**
Thomas J Gallitano
Conn Kavanaugh Rosenthal Peisch & Ford
10 Post Office Square
4th floor
Boston, MA 02109
Phone: 617-482-8200
Fax: 617-482-6444
Active 08/23/2005 Notify

**Private Counsel 648310**
Michael R Bernardo
Conn Kavanaugh Rosenthal Peisch & Ford
10 Post Office Square
4th Floor
Boston, MA 02109
Phone: 617-482-8200
Fax: 617-482-6444
Active 08/23/2005 Notify

**Defendant**
Pamela Campbell
Served: 08/24/2005
Served (answr pending) 08/31/2005

**Private Counsel 639547**
Richard J Rosensweig
Goulston & Storrs
400 Atlantic Avenue
Boston, MA 02110-3333
Phone: 617-482-1776
Fax: 617-574-4112
Active 09/14/2005 Notify

**Defendant**
Robert Campbell
Served: 08/24/2005
Served (answr pending) 08/31/2005

*** See Attorney Information Above ***

### ENTRIES

| Date | Paper | Text |
|---|---|---|
| 08/23/2005 | 1.0 | Complaint & jury claim filed $275.00 entry fee paid |
| 08/23/2005 | | Origin 1, Type D13, Track A. |

MASXP-20050621                                                                                    09/14/2005
kramercy                                                                                          09:42 AM

**Commonwealth of Massachusetts**
**NORFOLK SUPERIOR COURT**
**Case Summary**
**Civil Docket**

### NOCV2005-01456
### Opus Inc v Campbell et al

| Date | Paper | Text |
|------|-------|------|
| 08/23/2005 | 2.0 | Civil action cover sheet filed |
| 08/23/2005 | | average track notice sent to plffs attorney |
| 08/31/2005 | | ONE TRIAL review by Clerk, Case is to remain in the Superior Court |
| 08/31/2005 | 3.0 | SERVICE RETURNED: L&U Pamela Campbell(Defendant) 44 Green Acres Street, Morin Heights, Quebec, Canada 8/24/05 |
| 08/31/2005 | 4.0 | SERVICE RETURNED: in hand to Robert Campbell(Defendant) 8/24/05 |
| 09/14/2005 | 5.0 | Defts. Pamela & Robert Campbell's Notice of Removal to U S District Court (Rec'd. 9/13/05) |
| 09/14/2005 | | Case REMOVED this date to US District Court of Massachusetts |

**EVENTS**



A TRUE COPY
Attest: _____
Deputy Assistant Clerk
9/14/05





*5 -1456*

hereby certi
regoing
] :lectr
] elect
] original fil d in
aral A
eputy Clerk
y:
OF MASS
opy of the
on

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

OPUS, INC.

    Plaintiff,

v.

PAMELA CAMPBELL and ROBERT
CAMPBELL

    Defendants.

*9/13/05*
RECEIVED & FILED
**CLERK OF THE COURTS**
NORFOLK COUNTY
*( 9/14/05 )*

**05 CA 11843 NMG**

## NOTICE OF REMOVAL TO FEDERAL COURT
## PURSUANT TO 28 U.S.C. §§ 1332 AND 1441 ET SEQ.

    The Defendants, Pamela and Robert Campbell by their attorney, Goulston & Storrs P.

pursuant to 28 U.S.C. §§ 1332 and 1441 et seq. hereby give notice of removal of proceedings

the Trial Court of Massachusetts, Superior Court Department, Norfolk County between the

above-captioned parties bearing Civil No. NOCV2005-01456 to the United States District Co

for the District of Massachusetts for the reasons set forth below.

    1.    Removal is authorized pursuant to 28 U.S.C. § 1441(a) where the District Cou

of the United States have original jurisdiction. The District Court has diversity jurisdiction

pursuant to 28 U.S.C. §1332 where the matter in controversy exceeds the sum of $75,000

exclusive of interest and costs and is between citizens a state and citizens of a foreign state. /

set forth below, these requirements are met.

    2.    The Plaintiff, Opus, Inc. has alleged that it is a Massachusetts corporation with

principal place of business at 24 William Way, Bellingham, Massachusetts. This allegation is  t

3.     The Defendants, Pamela and Robert Campbell are Canadian citizens and individuals residing at 44 Green Acres, Morin Heights, Quebec, Canada.  See Complaint, ¶¶ 2

4.     Accordingly, there is complete diversity of citizenship among the parties to thi action.

5.     The only process, pleadings or order received by Defendants in this action are Complaint and a summons, dated August 22, 2005 ("Summons"), which were received by the Defendants on August 24, 2005.  A copy of the Summons is annexed hereto as Exhibit 2.

6.     The Complaint alleges that the Plaintiff had the right to terminate the Defendar employment for just cause based on purported breaches of contract by the Defendants and tha the Plaintiff has incurred damages in an amount "in excess of $25,000".  See Complaint, ¶ 27

7.     The Plaintiff further alleges that the Defendants have purportedly been "unjust enriched by their receipt of "generous monetary benefits" from the Plaintiff by way of salary ; other employment remuneration.  See Complaint, ¶ 38.

8.     The Plaintiff alleges that it is entitled to a declaratory judgment that it had just cause to terminate the Defendants' employment and thus need not pay the Defendants what tl are owed for the remainder of their Employment Agreements.  See Complaint, ¶ 48.

9.     The Defendants' Employment Agreements, which are attached to the Complai as Exhibits A and B respectively, contemplate that each Defendant will receive an annual sala of $75,000 and annual incentive bonuses equal to 5% of the amount by which net sales of "Eligible Products" exceed an "Applicable Base Amount" as defined in the Employment Agreements.  See e.g., Complaint, Ex. A, § 4.  Each of the Defendants' Employment Agreem ; further contemplates that the Plaintiff will pay to each Defendant two equal installments of $32,500 ("Non-Competition Payments") payable on the first and second anniversary dates of

Employment Agreements, *i.e.* October 3. 2004 and October 3, 2005. See id., § 5(a) Thus, the Defendants each received a \$32,500 Non-Competition Payment (totaling \$65,000) on Octobe 2004 and are each entitled to a further Non-Competition Payments in the same amount on October 3, 2005 under the terms of their Employment Agreements.

10. The Defendants were employed by the Plaintiff from October 3, 2003 through August 15, 2005, and thus each received \$75,000 salaries (totaling \$150,000) for the 12 mont period October 3, 2003 through October 3, 2004 and each received approximately \$66,000 of salary (totaling \$132,000) for the period October 4, 2004 through August 15, 2005. Thus the total salaries received by both Defendants during the period in which they were employed by Plaintiff is approximately \$282,000.

11. In view of the foregoing, the damages sought by the Plaintiff for unjust enrichment, corresponding to the salary and Non-Competition Payments received by the Defendants under the Employment Agreements total at least \$347,000 (*i.e.* \$282,000 in paid salary and \$65,000 in paid Non-Competition Payments).[1]

12. Moreover, the effect of the declaratory judgment that the Plaintiff seeks would to excuse the Plaintiff from paying a total of \$65,000 of further Non-Competition Payments d on October 3, 2005 (See e.g., Complaint, Ex. A § 10(b)) and \$75,000 of annual salary for eac Defendant until the end of the term of each Employment Agreement on October 3, 2008. See id., § 2 (five year employment term). Thus the payments to the Defendants under the remaind of the term Employment Agreements that the Plaintiff seeks to avoid in this lawsuit total over \$515,000.

---

[1] The Plaintiff's total claim would increase in the event that the Plaintiff is seeking to recover amounts paid by w of signing bonuses and car allowances under the Employment Agreements as well. See Complaint, Ex. A , §§ 4

13.     Accordingly, the amount in controversy is this matter is in excess of $862,000

(*i.e.* $347,000 plus $515,000) and thus far exceeds the $75,000 threshold for the District Cour

of the United States to have jurisdiction under 28 U.S.C. § 1332(a).

14.     Thus, because this Court has original jurisdiction of this matter based on the

diversity of citizenship of the parties and the amount in controversy, removal is proper pursua

to 28 U.S.C. §§ 1441 et seq.

                    PAMELA CAMPBELL AND
                    ROBERT CAMPBELL,

                    By their attorney,

                    Richard J. Rosensweig (BBO #639547)
                    GOULSTON & STORRS, P.C.
                    400 Atlantic Avenue
                    Boston, MA 02110-3333
                    (617) 482-1776

Dated: September 12, 2005

A TRUE COPY
Attest: _____
Deputy Assistant Clerk
9/14/05

## Certificate of Service

I, Richard J. Rosensweig, hereby certify that on September 12, 2005 I served the foregoing Notice of Removal to Federal Court Pursuant to 28 U.S.C. §1332 and 1441 et seq. first class mail, postage prepaid, upon counsel for the Plaintiff.

Richard J. Rosensweig



*goulston*&stor ;
counsellors at law

Richard J. Roser      g
rrosensweig@goulstonstorr    n
(617) 574-358    :l
(617) 574-750    x

September 12, 2005

## BY HAND DELIVERY



Civil Clerk's Office
United States District Court
 for the District of Massachusetts
John Joseph Moakley U.S. Courthouse
One Courthouse Way
Boston, MA 02210

Re:    Opus, Inc. v. Pamela Cambpell and Robert Campbell
         Massachusetts Superior Court No. NOCV2005-1456

Dear Sir or Madam:        **05  CA  11843 NMG**

        Enclosed for filing in the above-captioned matter please find a Notice of Removal anc attachments thereto. Also enclosed is a check in the amount of Two Hundred Fifty Dollars ($250.00) for the filing fee and Civil Action Cover Sheet.

        Please stamp the enclosed copy of the Notice of Removal, acknowledging your receip and filing of the same, and return it to the messenger who will wait.

        Thank you for your attention to this matter.

                                        Very truly yours,

                                        Richard J. Rosensweig

RJR/mfr
Enclosure
cc:    Thomas J. Gallitano, Esq. (w/enclosures by first class mail)
GSDOCS\1527277.1 9/12/2005 11:46 AM

4.

(TO PLAINTIFF'S ATTORNEY:  PLEASE CIRCLE TYPE OF ACTION INVOLV ):-
TORT - MOTOR VEHICLE TORT - CONTRA -
EQUITABLE RELIEF - OTHER.)

## COMMONWEALTH OF MASSACHUSETTS

NORFOLK, ss.

SUPERIOR C    RT
CIVIL ACTIO

NO.   NOCV2   5-01456

Opus, Inc.

............................................., *Plaintiff(s)*

**v.**
Pamela Campbell and
Robert Campbell

............................................., *Defendant(s)*

8/31/16

REC  ED & FILED
C' -  -OUR

### SUMMONS

To the above-named Defendant:    Robert Campbell

You are hereby summoned and required to serve upon  Michael R. Ber    rdo,
Ten Post Office Square
plaintiff's attorney, whose address is ..Boston,.MA..02109................, an answer to    com-
plaint which is herewith served upon you, within 20 days after-service of this summons u    you,
exclusive of the day of service.  If you fail to do so, judgment by default will be taken ag    t you
for the relief demanded in the complaint.  You are also required to file your answer to    com-
plaint in the office of the Clerk of this court at Dedham either before service upon plaintiff':    orney
or within a reasonable time thereafter.

Unless otherwise provided by Rule 13(a), your answer must state as a cou    claim
any claim which you may have against the plaintiff which arises out of the transaction    occur-
rence that is the subject matter of the plaintiff's claim or you will thereafter be barred fro    aking
such claim in any other action.

WITNESS, SUZANNE V. DELVECCHIO, *Esquire*, at .........................the ........    d .........

day of ........August.................., in the year of our Lord two thousand and ....five........    ..........

**A TRUE COPY**
Attest: _____
**Deputy Assistant Clerk**
9/14/05

Clerk.

NOTES:
1. This summons is issued pursuant to Rule 4 of the Massachusetts Rules of Civil Procedure.
2. When more than one defendant is involved, the names of all defendants should appear in    caption.
If a separate summons is used for each defendant, each should be addressed to the particular    ndant.

F-33

3. (

(TO PLAINTIFF'S ATTORNEY:  PLEASE CIRCLE TYPE OF ACTION INVOL  D:-
TORT - MOTOR VEHICLE TORT - CONTR  Γ -
EQUITABLE RELIEF - OTHER.)

## COMMONWEALTH OF MASSACHUSETTS

NORFOLK, ss.                                              SUPERIOR (    JRT
                                                          CIVIL ACTI(

                                                    NO.   NOCV    )5-01456

            Opus, Inc.
      ..........................................., *Plaintiff(s)*

            **v.**
      Pamela Campbell and
      Robert Campbell
      ..........................................., *Defendant(s)*

### SUMMONS

To the above-named Defendant: Pamela    Campbell

        You are hereby summoned and required to serve upon ...Michael R. Be...ardo,
                              Ten Post Office Square
plaintiff's attorney, whose address is ...Boston,..MA..02109..................., an answer to    e com-
plaint which is herewith served upon you, within 20 days after service of this summons    n you,
exclusive of the day of service.  If you fail to do so, judgment by default will be taken a    1st you
for the relief demanded in the complaint.  You are also required to file your answer to    e com-
plaint in the office of the Clerk of this court at Dedham either before service upon plaintif:    ttorney
or within a reasonable time thereafter.

        Unless otherwise provided by Rule 13(a), your answer must state as a co    erclaim
any claim which you may have against the plaintiff which arises out of the transactio    : occur-
rence that is the subject matter of the plaintiff's claim or you will thereafter be barred fr    making
such claim in any other action.

        WITNESS, SUZANNE V. DELVECCHIO, *Esquire*, at ...Boston......the ........    rd
                                                                                  ...........
day of .....August........................, in the year of our Lord two thousand and ...five......    ...........

        **A TRUE COPY**
Attest: _____
        Deputy Assistant Clerk                                                   ____ Clerk.
        9/14/05

NOTES:
1.  This summons is issued pursuant to Rule 4 of the Massachusetts Rules of Civil Procedure.
2.  When more than one defendant is involved, the names of all defendants should appear i    e caption.
    If a separate summons is used for each defendant, each should be addressed to the particular    fendant.

F-33

| CIVIL ACTION COVER SHEET | DOCKET NO.(S) 05 01456 | Trial Court of Massachusetts Superior Court Dep County: | usetts ment |

**PLAINTIFF(S)**
Opus, Inc.

**DEFENDANT(S)**
Pamela Campbell
Robert Campbell

ATTORNEY, FIRM NAME, ADDRESS AND TELEPHONE Thomas J. Gallitano, BBO#550745, Michael R. Bernardo, BBO#648310, Conn Kavanaugh, Board of Bar Overseers number: Ten Post Office Square, Boston, MA 02109 617-482-8200

ATTORNEY (if known) Zavie Levine, Es Frishman, 3500 boul. de Mals Ouest Bureau 1600, Westmount H3Z3C1
, Levine
neuve,
Quebec

**Origin code and track designation**

Place an x in one box only:
- ☒ 1. F01 Original Complaint
- ☐ 2. F02 Removal to Sup.Ct. C.231,s.104 (Before trial) (F)
- ☐ 3. F03 Retransfer to Sup.Ct. C.231,s.102C (X)
- ☐ 4. F04 District Court Appeal c.231, s trial) (X)
- ☐ 5. F05 Reactivated after rescript; reli judgment/Order (Mass.R.Civ.P. 60
- ☐ 6. E10 Summary Process Appeal (X

'&104 (After

**TYPE OF ACTION AND TRACK DESIGNATION (See reverse side)**

| CODE NO. | TYPE OF ACTION (specify) | TRACK | IS THIS A JURY CASE? |

C01 Services, Labor and Materials   (F)   ( X) Yes   ( ) No
D13 Declaratory Judgment

The following is a full, itemized and detailed statement of the facts on which plaintiff relie money damages. For this form, disregard double or treble damage claims; indicate single

o determine mages only

**TORT CLAIMS**
(Attach additional sheets as necessary)

A. Documented medical expenses to date:
   1. Total hospital expenses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
   2. Total Doctor expenses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
   3. Total chiropractic expenses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
   4. Total physical therapy expenses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
   5. Total other expenses (describe) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
                                                                                                          Subtotal . . . . . . . . . .
B. Documented lost wages and compensation to date . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
C. Documented property damages to date . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
D. Reasonably anticipated future medical and hospital expenses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
E. Reasonably anticipated lost wages . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
F. Other documented items of damages (describe)

. . . . . . . . . .

G. Brief description of plaintiff's injury, including nature and extent of injury (describe)

A TRUE COPY
Attest: [signature]
Deputy Assistant Clerk
9/14/05
                                                                                                          **TOTAL** . . . . . . . . . .

**CONTRACT CLAIMS**
(Attach additional sheets as necessary)

Provide a detailed description of claim(s): Complaint for breach of contract, breach covenant of good faith and fair dealing, unjust enrichment, and for by the Court, pursuant to G.L. c. 231A, §1, that the plaintiff, Op "just cause" to terminate the defendants' employment as defined in defendants' respective employment agreements.
                                                                                                          **TOTAL**
: the impl
declarat
Inc., ha
ne
25,000.00

PLEASE IDENTIFY, BY CASE NUMBER, NAME AND COUNTY, ANY RELATED ACTION PENDING IN TH COURT DEPARTMENT
SUPERIOR

"I hereby certify that I have complied with the requirements of Rule 5 of the Supreme Judicial Cour Dispute Resolution (SJC Rule 1:18) requiring that I provide my clients with information about court resolution services and discuss with them the advantages and disadvantages of the various metho
niform Rules o
nnected dispu

Signature of Attorney of Record [signature]    E: 8/23/05

AOTC-6 mtc005-11/99
A.O.S.C. 1-2000

COMMONWEALTH OF MASSACHUSETTS

NORFOLK, ss.                                    SUPERIOR COURT DEPARTMENT
                                                OF THE TRIAL COURT
                                                CIVIL ACTION NO.

                                           )       05   0 . 45 0
OPUS, INC.,                                )
           Plaintiff,                      )
v.                                         )
                                           )    **COMPLAINT AND JURY DEMAN**
PAMELA CAMPBELL and                        )
ROBERT CAMPBELL,                           )
           Defendants.                     )
                                           )

Introduction

This is a complaint for breach of contract, breach of the implied covenant of good faith and fair dealing, unjust enrichment, and for a declaration by the Court, pursuant to G.L. c. 231 §1, that the plaintiff, Opus, Inc., had "just cause" to terminate the defendants' employment as defined in the defendants' respective employment agreements.

Parties, Jurisdiction and Venue

1.    Plaintiff, Opus, Inc., is a Massachusetts corporation with a principal place of business at 24 William Way, P.O. Box 525, Bellingham, County of Norfolk, Massachusetts.

2.    Defendant, Pamela Campbell, is an individual formerly employed by Opus, wh currently resides at 44 Green Acres, Morin Heights, Quebec, Canada, JOR 1H0.

3.    Defendant, Robert Campbell, is an individual formerly employed by Opus, wh currently resides at 44 Green Acres, Morin Heights, Quebec, Canada, JOR 1H0. On informat and belief, the defendants are husband and wife.

4.    The Court has jurisdiction over this matter because the action involves a reque pursuant to G.L. c. 231A, §1, for a declaration of rights and obligations under an employment

agreement, which all parties agreed would be resolved by a Massachusetts Court (See Employment Agreements of Pamela Campbell and Robert Campbell, § 19, attached hereto as Exhibit A and B, respectively). Further, the defendants had numerous and sufficient contacts with the Commonwealth of Massachusetts to satisfy the requirements of both the Massachuset Long-Arm Statute, G.L. c. 223A, and the Due Process Clause of the United States Constitution

5.     Venue is proper in this Court because at least one of the parties resides in, or ha principal place of business in, Norfolk County.

## Factual Allegations

6.     The Plaintiff, Opus, Inc., is a privately held home and garden products compan specializing in the distribution and sale of bird feeders, bird houses, bird baths, outdoor clocks and thermometers, patio furniture and other related products.

7.     On or about October 3, 2003, the plaintiff purchased the assets of The Compan Garden, Inc., ("TCG"), an Ontario-based business engaged in the design, manufacture and distribution of bird houses, pursuant to an Asset Purchase Agreement. Prior to its purchase, T was owned by defendant Robert Campbell and a third-party, and operated principally by the defendants.

8.     As an inducement to entering into the Asset Purchase Agreement, the plaintiff required the defendants to continue working for the plaintiff for a five-year period and to exec employment agreements reflective of the terms and conditions under which they would work the plaintiff. (See Exhibits A and B, p. 1).

9.     Pursuant to Section 3 ("Duties") of the defendants' employment agreements,[1] defendants' primary duties and responsibilities were in sales, though it was understood that

---

[1] Aside from the name of the employee, the defendants' employment agreements are identical in all material respects.

2

defendant Robert Campbell would focus more on product development. Their employment wa full-time and they were "at all times" required to "use [their] best efforts to discharge [their] duties in furtherance of the [plaintiff's] interests." (See Exhibit A and B, § 3).

10.    Pursuant to Section 4 of their employment agreements, the plaintiff paid the defendants significant annual base salaries and signing bonuses for their anticipated full-time work and best efforts on behalf of the company.

11.    Pursuant to Section 5 of the employment agreements, and as an inducement for each of the defendants to devote their full-time and best efforts on behalf of the company, the plaintiff agreed to pay incentive bonuses on predetermined criteria.

12.    Under Section 8(b) ("Termination") of the defendants' employment agreements the plaintiff had the right, upon written notice, to terminate the defendants' employment for ju cause. "Just Cause" is defined under the employment agreements to include, among other circumstances, the defendants' "willful and substantial misconduct," "gross neglect of duties," "repeated failure to be present at work during normal business hours" and/or "the material bre of any other covenant, condition, or agreement contained in the employment agreement or in t Asset Purchase Agreement." (See Exhibit A and B, § 8(b)(i), (ii), (v), and (ix)).

13.    Section 8(b) further provided that due to the fact that the defendants were marr the defendants acknowledged and agreed that their employment was linked, and that should or of them be terminated for "just cause," the other defendant's continued employment would create a difficult and unacceptable situation for the plaintiff, constituting "just cause" to terminate the remaining defendant's employment as well.

3

14.     The defendants executed their respective employment agreements on or about October 3, 2003, and began working for the plaintiff from home at their Quebec residence immediately thereafter.

15.     Within a year of her employment with the plaintiff, primarily on account of disappointing sales performance in her region, the plaintiff suspected that defendant, Pamela Campbell, was not working full-time or using her best efforts at all times to discharge her duti in furtherance of the plaintiff's interests as required by her employment agreement.

16.     In or around the fall of 2004, the plaintiff issued the defendant Mrs. Campbell a 15-month sales quota of $100,000 (Canadian dollars). As of July 31, 2005 (10 months into th quota period), Mrs. Campbell was $52,000 below her $100,000 sales quota.

17.     The plaintiff's suspicions concerning Mrs. Campbell's lack of effort and performance led the company to retain a private investigation firm to monitor the defendants' activities for seven business days in July, 2005. The firm's written report and video surveillar substantiated the plaintiff's suspicions in that neither defendant was observed working during business hours on any day of observation. Rather, one or both defendants was observed goin; an ice cream shop, grocery store, visiting friends, mowing the lawn, lounging in the yard, at tl gym, attending a beach party, and other like recreational events.

18.     At approximately the same time, the plaintiff began to monitor the email activ of the defendants, which revealed minimal business communications and activities on their pa

19.     As a consequence, the plaintiff concluded that the defendants were not (and ha not for some time) working full-time or using their best efforts at all times to discharge their duties in furtherance of the plaintiff's interests as required by Section 3 of their employment agreements.

4

20. On August 12, 2005, the plaintiff provided defendant, Pamela Campbell, with written notice that, effective August 15, 2005, it was terminating her employment for "just cause" pursuant to Section 8(b) of her employment agreement. (A true and accurate copy of th plaintiff's August 12, 2005 termination letter to Mrs. Campbell is attached hereto as Exhibit C

21. Pursuant to Section 8(b) of his employment agreement, the plaintiff terminated defendant, Robert Campbell's employment because his wife's employment had been terminate for "just cause" under her employment agreement, which constituted "just cause" to terminate his employment under his agreement as well. (A true and accurate copy of the plaintiff's Aug 12, 2005 termination letter to Mr. Campbell is attached hereto as Exhibit D). In addition, the plaintiff terminated Mr. Campbell's employment because the investigative report revealed tha he was not working on behalf of the company during business hours on any day of the firm's investigation.

22. By letter dated August 17, 2005, the defendants (through their counsel) dispute that the plaintiff had "just cause" to terminate their employment. (A true and accurate copy o the letter from defendants' counsel dated August 17, 2005 is attached hereto as Exhibit E).

## COUNT I
### (Breach of Contract)

23. The plaintiff repeats and realleges Paragraphs 1 through 22 of this Complaint, incorporates them as if fully set forth herein.

24. Pursuant to their employment agreements, Mr. and Mrs. Campbell had contrac duties to work full-time and to use their best efforts at all times to discharge their duties in furtherance of the plaintiff's interests.

25. The plaintiff has fully performed all of its duties and obligations under the employment agreements executed by the defendants.

5

26.     The defendants, Mr. and Mrs. Campbell have materially breached the terms of

their employment agreements with the plaintiff by failing to work full-time or to use their best

efforts at all times to discharge their duties in furtherance of the plaintiff's interests.

27.     As a direct and proximate result of the defendants' material breach of their

employment agreements, the plaintiff has incurred substantial damages, including compensato

damages, in an amount in excess of $25,000.00.

WHEREFORE, the plaintiff demands judgment against the defendants in an amount to

determined by the Court, plus interest, costs, attorneys' fees, and such other relief as this Cour

deems just and proper.

## COUNT II
### (Breach of the Implied Covenant of Good Faith and Fair Dealing)

28.     The plaintiff repeats and realleges Paragraphs 1 through 27 of this Complaint, a

incorporates them as if fully set forth herein.

29.     In Massachusetts, every contract contains an implied covenant of good faith an

fair dealing between the parties to it.

30.     The defendants' failure to work full-time or to use their best efforts at all times

discharge their duties in furtherance of the plaintiff's interests had the effect of destroying or

injuring the plaintiff's right to receive the fruits of the employment agreements with the

defendants.

31.     The defendants' actions or failure to act constitute a material breach of the

implied covenant of good faith and fair dealing.

32.     The defendants' material breaches of said covenant were willful and intentiona

and were done in wanton and intentional disregard of the plaintiff's rights and interests.

6

33.    As a direct and proximate result of the defendants' breach of their duties of goo

faith and fair dealing, the plaintiff has incurred substantial damages, including compensatory

damages, in an amount in excess of $25,000.

WHEREFORE, the plaintiff demands judgment against the defendants in an amount to

determined by the Court, plus interest, costs, attorneys' fees, and such other relief as this Cour

deems just and proper.

## COUNT III
### (Unjust Enrichment)

34.    The plaintiff repeats and realleges Paragraphs 1 through 33 of this Complaint, a

incorporates them as if fully set forth herein.

35.    Pursuant to the defendants' employment agreements, the plaintiff paid the

defendants significant annual base salaries and signing bonuses for their anticipated full-time

work and best efforts on behalf of the company.

36.    The defendants failed to work full-time or to use their best efforts at all times t

discharge their duties in furtherance of the plaintiff's interests, in material breach of their

employment agreements with the plaintiff.

37.    The defendants have accepted, used and enjoyed the monetary benefits conferr

by the plaintiff with the knowledge that they were obligated to work full-time and to use their

best efforts at all times to discharge their duties in furtherance of the plaintiff's interests.

38.    The defendants have been unjustly enriched by their receipt of generous mone

benefits from the plaintiff without having earned same by working full-time or using their be

efforts at all times to discharge their duties in furtherance of the plaintiff's interests.

7

WHEREFORE, the plaintiff demands judgment against the defendants in an amount to determined by the Court, plus interest, costs, attorneys' fees, and such other relief as this Cour deems just and proper.

## COUNT IV
### (Declaratory Judgment – G.L. c. 231A §1)

39.     The plaintiff repeats and realleges Paragraphs 1 through 38 of this Complaint, a incorporates them as if fully set forth herein.

40.     In consideration for agreeing to execute the Asset Purchase Agreement and to p the defendants significant annual base salaries and signing and incentive bonuses, the plaintiff required, among other consideration, that the defendants work full-time and to use their best efforts at all times to discharge their duties in furtherance of the plaintiff's interests.

41.     The defendants agreed to work full-time and to use their best efforts at all time: discharge their duties in furtherance of the plaintiff's interests in exchange for the company's execution of the Asset Purchase Agreement and significant annual base salaries and signing a incentive bonuses, and such terms were memorialized in the Asset Purchase Agreement and/o their respective employment agreements.

42.     The defendants' agreement to work full-time and to use their best efforts at all times to discharge their duties in furtherance of the plaintiff's interests was a material inducement for the plaintiff to execute the Asset Purchase Agreement, acquire the business of TCG and pay the defendants significant annual base salaries and signing and incentive bonus as set forth in Sections 4 and 5 of their employment agreements. The plaintiff would not have agreed to execute the Asset Purchase Agreement, acquire the business of TCG or pay the defendants significant annual base salaries or signing and incentive bonuses had the defendan

8

not agreed to work full-time and to use their best efforts at all times to discharge their duties in furtherance of the plaintiff's interests.

43.    As set forth more fully above, the defendants failed to work full-time or to use their best efforts at all times to discharge their duties in furtherance of the plaintiff's interests.

44.    The defendants' aforementioned failure to work full-time or to devote their bes efforts at all times to discharge their duties in furtherance of the plaintiff's interests constitute material breach of their employment agreements.

45.    The plaintiff contends that as a result of the defendants' failure to work full-tin or to use their best efforts at all times to discharge their duties in furtherance of the plaintiff's interests, in material breach of their employment agreements, the plaintiff had just cause to terminate the defendants' employment as that term is defined in Section 8(b) of the defendant employment agreements.

46.    The defendants disagree with the plaintiff's contention that the company had ju cause to terminate their employment. Therefore, an actual controversy has arisen between the plaintiff and the defendants as to the parties' rights and obligations under the defendants' employment agreements.

47.    Despite having suffered damages as a result of the defendants' material breach their employment agreements, the plaintiff has made a good faith effort to resolve this controversy prior to filing suit.

48.    The plaintiff is entitled to a declaration by this Court that the defendants have materially breached their respective employment agreements and that, therefore, the plaintiff just cause to terminate the defendants' employment as that term is defined in Section 8(b) of their employment agreements.

9

WHEREFORE, the plaintiff respectfully requests that this Court enter judgment

declaring the rights and obligations of the parties under the defendants' employment agreem    s,

including a declaration that the defendants have materially breached their respective employ:    it

agreements and that, therefore, the plaintiff had "just cause" to terminate their employment a

that term is defined in Section 8(b) of the defendants' employment agreements, to otherwise

award the plaintiff its costs and attorneys' fees, and enter such other relief as the Court deem

just and proper.


## JURY DEMAND

The plaintiff, Opus, Inc., respectfully requests a trial by jury on all issues so triable.


                          Respectfully submitted,

                          OPUS, INC.

                          By its attorneys,

                          _Thomas J. Gallitano_

                          _Michael Bernardo_

                          Thomas J. Gallitano, BBO # 550745
                          Michael R. Bernardo, BBO # 648310
                          CONN KAVANAUGH ROSENTHAL
                          PEISCH & FORD, LLP
                          Ten Post Office Square
                          Boston, MA 02109
                          (617) 482-8200

Dated: August 22, 2005

A TRUE COPY
Attest:
Deputy Assistant Clerk
9/14/05

10

A

## EMPLOYMENT AGREEMENT

EMPLOYMENT AGREEMENT made this 3rd day of $October$, 2003 by and between OPUS, Inc., a Massachusetts corporation with a principal place of business at 24 William Way, P.O. Box 525, Bellingham, MA 02019-0525 (the "Company") and Pamela Campbell, an individual residing at 44 Green Acres, Morin Heights, Quebec, Canada J0R 1H0 (the "Employee").

WHEREAS, as of the date hereof the Company has purchased substantially all of the assets of The Company Garden Inc., an Ontario corporation ("TCG"), pursuant to an Asset Purchase Agreement executed by and among the Company, TCG, the Employee, and Robert Campbell (the "Asset Purchase Agreement");

WHEREAS, as an inducement to entering into the Asset Purchase Agreement and closi on the purchase of assets from TCG, the Company has required and Employee has agreed to enter into an employment agreement upon the terms set forth herein;

NOW, THEREFORE, in consideration of the mutual covenants and agreements set fort herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Company and the Employee hereby agree as follows:

1.    Employment. The Company hereby agrees to employ the Employee, and the Employee hereby accepts such employment, upon the terms and conditions hereinafter set fortl The Employee represents and warrants to the Company that her employment by the Company and the performance of her duties as contemplated by this Agreement do not and will not viola the terms or conditions of any other agreement or understanding by which the Employee is bound or subject, and that the Employee knows of no basis for any claim that she is so bound o subject.

2.    Term. This Agreement shall commence on the date hereof, and shall continue i effect for a term of five (5) years unless earlier terminated as provided in Section 8 hereof.

3.    Duties. The Employee's primary responsibilities with the Company shall be in sales with particular emphasis on growing the business of the product line previously introduce by TCG under the Country Nests Nids De Campagne® brand, as such line may hereafter be modified, enhanced and expanded by the Company during the term hereof. Employee shall have such other responsibilities consistent with her general experience and training as may be prescribed by the President of the Company from time to time. Employee acknowledges that h employment by the Company is full-time and that she shall at all times use her best efforts to discharge her duties in furtherance of the Company's interests. The parties hereto affirm that Employee shall discharge her duties hereunder from her home unless a substitute location reasonably proximate to Employee's home is procured and such location is reasonably acceptable to Employee. The Employee agrees that in the course of her performance of duties, she will be required to travel both domestically and internationally as deemed necessary or appropriate by the Company, including without limitation, travel to sales and strategic planning

meetings conducted by the Company. All pre-approved travel expenditures will be paid by the Company subject to Employee's compliance with travel and expense guidelines utilized by the Company for its sales employees generally.

4.    Salary/Signing Bonus. As compensation for the services to be rendered by the Employee under this Agreement, the Company shall pay to the Employee a salary of Seventy-Five Thousand ($75,000) U.S. Dollars per year (the "Salary"), payable in accordance with the Company's normal payroll policies. In addition to payment of Salary, the Company also agrees to remit to Employee a one-time signing bonus of Forty Thousand ($40,000) U.S. Dollars, payable upon execution of this Agreement. The Company agrees to adjust the signing bonus with a payment on or before January 31, 2004 of an additional Ten Thousand ($10,000) U.S. Dollars if and only if "net sales" by the Company of "Country Nests Products" for the period September 1, 2003 through December 31, 2003 exceeds net sales of Country Nests Products made by TCG for the same quarterly period in 2002. For purposes of this Agreement, (i) "net sales" means gross sales less GST, PST, any and all other sales and excise taxes, returns, allowances, and discounts and (ii) "Country Nests Products" means those products previously sold by TCG under the Country Nests Nids De Campagne® mark, together with all new and substitute products hereafter introduced by the Company for sale under the Country Nests Nids De Campagne® mark. In recognition that the Company will not have closed on its acquisition TCG assets until after September 1, 2003, the parties agree that sales of Country Nests Product from and after September 1, 2003 shall include sales made by TCG from and after such date through the date of closing.

5.    Incentive Bonus.

(a)    During each year of Employee's employment hereunder, Employee will be entitled to an annual incentive bonus equal to five (5%) percent of the amount by which net sal of "Eligible Products" (as measured in U.S. Dollars for the twelve (12) months ending on the d preceding each anniversary date of this Agreement) exceeds the "Applicable Base Amount". F purposes hereof, the initial Applicable Base Amount shall be One Million Sixty Two Thousand One Hundred Forty-Three ($1,062,143) U.S. Dollars, such amount representing net sales by TCG (as converted to U.S. Dollars) for the year ended July, 31, 2003. Commencing with the second and all successive years of the term of this Agreement, the Applicable Base Amount sh be the greater of (i) One Million Sixty Two Thousand One Hundred Forty-Three ($1,062,143) U.S. Dollars or (ii) the highest level of net sales of Eligible Products achieved for any twelve (12) month period ending on the day prior to an anniversary date of this Agreement. As used this Agreement, the term "Eligible Products" means products now and hereafter sold by the Company under the Country Nests Nids De Campagne® brand.

*For illustrative purposes only, assume this Agreement is executed September 30, 2003 and that net sales of Eligible Products are $1.3M and $1.7M for the twelve months ended on September 29, 2004 and September 29, 2005 respectively. The incentive bonus for the first employment year ended September 29, 2004 would be determined as follows: ($1,300,000 - $1,062,143) x 5% = $11,892.85. The incentive bonus for the second employment year ended September 29, 2005 would be ($1,700,000 - $1,300,000) x 5% = $20,000.*

2



(b)      All incentive bonuses will be paid within forty-five (45) days of the close of eac anniversary date of this Agreement. The Company agrees that it will increase the amount of th incentive bonus to six (6%) percent for any employment year in which the Company's gross margin for sales of Eligible Products equals or exceeds 45.2%. The term "gross margin" mean net sales less cost of product, agent commissions, duty, freight, and broker fees. The Company agrees to include a statement of calculation of gross margin with each remittance of incentive bonus earned hereunder.

(c)      The parties hereto acknowledge that in the event the Company should sell all or substantially all of its assets and the purchaser thereof shall refuse either to assume this Agreement or assume the incentive bonus obligations owed to Employee under this Section 5, Employee will forfeit her valuable right to earn the bonus amounts provided in this Section 5. Accordingly, the Company agrees that upon the occurrence of any such event, Employee shall deemed to have earned a one-time fixed payment in lieu of the incentive bonus in the amount stated below:

| Date of Sale | Amount Earned |
|---|---|
| Prior to 2nd anniversary of this Agreement | $75,000 |
| Between 2nd and 3rd anniversary of Agreement | $50,000 |
| Between 3rd and 4th anniversary of Agreement | $40,000 |
| Between 4th and 5th anniversary of Agreement | $20,000 |

The Company agrees to remit the amount so earned within ten (10) days following closing of a such sale. Notwithstanding the foregoing, should a purchaser offer employment to Employee : a comparable base salary with an incentive bonus substantially comparable to that stated in subsection (a) above, and such employment is refused by Employee, the Company shall be relieved of its obligation to remit any fixed payment to Employee under this subsection (c) anc Employee shall be deemed to have forfeited her right to receive any payment under this subsection.

6.      Reimbursement of Business Expenses. The Company agrees to reimburse the Employee for all reasonable out-of-pocket expenses incurred in connection with Company business in accordance with the policies of the Company, as those policies may be amended or modified from time to time. Reimbursable expenses include, without limitation, authorized travel, cell phone, office and business supplies.

7.      Vacation/Benefits.

(a)      The Employee shall be entitled to four (4) weeks paid vacation per year.

(b)      The Company shall provide the Employee with dental and prescription coverag comparable to benefits historically provided to Employee by TCG.

(c)      The Company shall provide the Employee with an automobile allowance in the amount of Three Hundred Fifty ($350) U.S. Dollars per month during the term of this

3

Agreement. Employee shall be responsible for all insurance, registration, service, repair, fuel (subject to mileage reimbursement for business use) and any and all other expenses associated with the operation and maintenance of such vehicle.

8.    Termination.

(a)    This Agreement shall terminate immediately in the event of the Employee's death. Should the Employee become physically or mentally disabled or ill to the extent that she is unable to substantially perform her duties hereunder to the reasonable satisfaction of the President of the Company (i) for a period of ninety (90) consecutive days, or (ii) for shorter periods aggregating ninety (90) days during any period of three hundred sixty-five (365) consecutive calendar days, the Company may, at its option, elect to terminate the Employee's employment at any time thereafter while such disability or illness continues by giving written notice thereof to the Employee. If the Company believes Employee to be physically or mentall incapable of performing the services required of her hereunder, the Company may require Employee to be examined by a physician selected by it to verify or to determine the extent of such disability and such physician's determination, as certified to the Company, as to whether Employee is or is not capable of performing the services required of her hereunder, shall be binding and conclusive. In the event Employee's employment hereunder shall terminate on account of death or disability, the Company agrees that it will continue to pay to the Employee (or her estate following death), as a death or disability benefit, the incentive bonus referenced i Section 5 above to the extent earned during the balance of the term, as fully as if Employee's employment had not in fact terminated on account of death or disability. In addition, should Employee's employment hereunder terminate on account of death or disability prior to the date that Employee has received payment in full for her non-competition and non-solicitation covenants set forth in Section 10 hereof, the Company hereby agrees that it will pay the remaining amounts due in consideration of such covenants as a death benefit and/or as a separation/disability benefit at the time(s) set forth in said Section 10 for payment thereof.

(b)    In addition to termination on account of death or disability, the Compan may, upon written notice to the Employee, terminate the Employee's employment under this Agreement for just cause. As used herein, "just cause" shall mean the Employee has engaged in: (i) willful and substantial misconduct with respect to the business and affairs of the Company; (ii) gross neglect of duties, dishonesty, deliberate disregard of any material rule or policy of the Company, or the commission by the Employee of any other action with intent to injure the Company; (iii) commission of an act involving larceny, embezzlement, or conversio or any act involving the misappropriation of Company funds; (iv) any activity resulting in a conviction for any crime pertaining or relating to the Company; (v) repeated failure to be present at work during normal business hours; (vi) violation of an express directive or any rule regulation established by the President of the Company, which violation continues uncured fo ten (10) days after written notice thereof has been given to the Employee (provided that Employee shall not have the right to cure successive violations of the same or similar directive (vii) abuse of alcohol or other drugs; (viii) violation of the confidentiality, non-competition, o non-solicitation covenants set forth herein, or (ix) the material breach of any other covenant, condition or agreement contained in this Agreement or in the Asset Purchase Agreement. In addition to the foregoing, Employee understands that her employment is linked to the

4

employment by the Company of her husband, Robert Campbell. Should the Company terminat Robert Campbell's employment for just cause under the terms of his employment agreement, Employee acknowledges that her continued employment with the Company would create a difficult and unacceptable situation for the Company constituting just cause for the Company tc terminate Employee hereunder. In the event Employee shall be terminated for just cause, Employee shall be entitled to receive all compensation then due and owing to gether with any incentive bonus previously earned and unpaid as of the date of such termination.

9.      Confidentiality.

The Employee hereby acknowledges that during the term of her employment hereunder, she will have access to confidential information of the Company, including marketii strategies, concepts, product designs, names of suppliers, customers, channel partners, manufacturers, and key employees, inventions, branding strategies, sales, cost and select financial information, and all information which prior to the date of acquisition of the assets of TCG by the Company was properly regarded as confidential and proprietary by TCG (collectively, "Confidential Information"). During the term of Employee's employment and at any time thereafter, Employee agrees that she shall not divulge or cause to be divulged, communicate or cause to be communicated, publish or cause to be published, or otherwise disclose or cause to be disclosed to any person, firm, corporation, association, or entity, any of the Confidential Information except as required to discharge her employment responsibilities hereunder. For purposes hereof, Confidential Information shall not include information whicl (a) at the time of disclosure to Employee was generally known to the relevant trade so as to no longer be a protectable trade secret, or (b) was lawfully received by Employee from a third par who independently, without prompting or assistance by Employee, developed or acquired sucl Confidential Information free of any obligation, express or implied, to the Company with resp thereto.

10.     Non-Competition and Non-Solicitation.

(a)     The Employee hereby acknowledges that the Company would not have entered into the Asset Purchase Agreement to purchase the assets of TCG or entered into this Agreement in the absence of Employee's covenants set forth in this Section 10. In furtherance thereof, Employee understands that the Company's success in operating and expanding the business previously conducted by TCG is highly dependent on maintaining customer, vendor and manufacturing relationships and the goodwill associated therewith. Accordingly, in order protect the goodwill of the Company and all Confidential Information, Employee hereby agre that during the term of her employment by the Company and for a period of two (2) years following any termination or expiration thereof, Employee will not:

(i)     directly or indirectly, either as an individual for Employee's own accou or as a partner or joint venturer, or as an advisor, consultant, representative, employee, officer, director, or shareholder of any corporation or other business entity, or in any other capacity, engage in enter into or participate in any way in any enterprise that is involved in development, manufacture, distribution, or sale within the United State

5

Canada of bird feeders, bird houses, knewel posts, candles, watering cans Adirondack chairs, benches, Christmas ornaments, bistro tables, or any other products which now or hereafter at any time during the term of Employee's employment are sold (or under active consideration for sale) by the Company; or

(ii)    directly or indirectly hire away or attempt to hire away or otherwise engage any employee, key advisor, or consultant of the Company.

(b)    In consideration for the covenants set forth in subsection (a) above, the Company agrees that it shall pay to the Employee the sum of Sixty-Five Thousand ($65,000) U.S. Dollars (the "Non-Competition Payment"). The Company has agreed, as an accommodation to the Employee, to remit the Non-Competition Payment in two (2) equal installments of Thirty-Two Thousand Five Hundred ($32,500) U.S. Dollars, payable on the firs and second anniversary dates of this Agreement. Employee acknowledges that the foregoing restriction is reasonable as to duration and scope, and has been bargained for as part of the transaction involving the Company's purchase of assets from TCG and the Company's commitment to provide employment to the Employee upon the terms set forth in this Agreeme Employee expressly affirms that the Non-Competition Payment constitutes fair and adequate consideration for such covenants, notwithstanding that payment may be made in full prior to th date of any termination or expiration of this Agreement. In the event Employee shall violate o challenge the enforceability of the terms of this Section 10, Employee agrees to return to the Company all monies received as her Non-Competition Payment.

11.    Assignment of Intellectual Property. Acknowledging that Employee will be involved in the design and development of new products for the Company, Employee hereby irrevocably assigns to the Company her entire right, title and interest in and to all inventions, improvements, discoveries, designs, product ideas, sketches, models, and other works of authorship, whether or not the subject of trademark, patent, industrial design or copyright protection (collectively "Intellectual Property") made, created, developed or reduced to practi by the Employee during the period of her employment with the Company, whether alone or jointly with other persons, and resulting from or arising out of any work performed by the Employee on behalf of the Company or connected with any matter relating or possibly relatin; any business in which the Company is involved. The Employee further irrevocably and expressly waives in favour of the Company and its successors and assigns any and all moral rights that she may have in the Intellectual Property. The Employee agrees to promptly discl to the Company all Intellectual Property and shall cooperate fully with the Company to obtain for the benefit of the Company or its assignees any patents, trademarks, copyrights or industri design protections thereon, and to execute and deliver to the Company any applications and assignments and any other lawful documents deemed necessary by the Company to carry out purposes of this Section 11, all without further consideration. In furtherance of the foregoing the Employee hereby irrevocably designates and appoints the Company and its duly authorize officers and agents as her agent and attorney-in-fact, to act for and in her behalf and stead to execute and file any such application and to do all other lawfully permitted acts to further the prosecution and issuance of trademarks, patents, industrial designs or copyrights or other

analogous protection with the same legal force and effect as if executed by the Employee.    T
Section 11 shall survive the termination or expiration of this Agreement.

12.    Survival of Covenants/Injunctive Relief. The Employee recognizes that the
covenants and agreements contained in Sections 9, 10 and 11 above have significant commerc
value, are critical to the protection of the Company's Confidential Information, trade secrets, ;
goodwill, and that the Company would be irreparably damaged, and its investment in the asse
of TCG materially impaired, if the Employee was to engage in any violation thereof.
Accordingly, the Employee expressly acknowledges that she is voluntarily entering into this
Agreement and that the terms and conditions contained herein, including Sections 9, 10 and 1
are fair and reasonable to the Employee in all respects. The Employee hereby further
acknowledges that the Company's remedy at law for breach or threat of breach of the provisio
of Sections 9, 10 or 11 is inadequate and that the Company shall have the right to seek injunct
relief in the event of any such breach or threatened breach, in addition to any other remedy
available to the Company. If any provision of Sections 9, 10 or 11 shall be invalid or
unenforceable to any extent or in any application, the parties hereto agree that the remainder o
said Sections and of such terms and conditions shall not be affected thereby, and each and eve
term and condition of said Sections shall be valid and enforced to the fullest extent and in the
broadest application provided by law. If the invalidity or unenforceability is due to the
unreasonableness of the time or scope or geographic extent of any covenant and restriction, sa
covenant and restriction shall nevertheless be effective for such period of time or within such
scope or geographical area as may be determined to be reasonable by a court of competent
jurisdiction. All of said covenants shall survive any expiration or termination of this Agreerne
in accordance with their terms.

13.    Waiver of Breach. The failure of any party at any time or times to require
performance of any provision hereof shall in no manner affect that party's right at a later time
enforce the same. No waiver by any party of the breach of any term or covenant contained in
this Agreement, whether by conduct or otherwise, in any one or more instances, shall be deem
to be, or construed as, a further or continuing waiver of any such breach, or a waiver of the
breach of any other term or covenant contained in this Agreement.

14.    Assignment. This Agreement shall be binding upon and inure to the benefit of
Company and its successors and assigns and shall be binding upon the Employee and her heirs
executors and administrators.

15.    Impact of Breach by the Company. The Company acknowledges that should i
be judicially determined that it (and not the Employee) has materially breached the terms of th
Agreement, and that as a result thereof, Employee has been excused of any further performanc
the Company shall remain liable to Employee for all amounts that otherwise would be due
hereunder as if this Agreement had not been so breached.

16.    Right to Suspend. In the event the Company shall assert any claim by way of
indemnification against Employee for matters arising under the Asset Purchase Agreement, the
Company may suspend payment of the incentive bonus and the Non-Competition Payment in a
amount equal to what the Company claims to be due. If it shall be determined that the amount

7



suspended and claimed to be due is in excess of what is in fact due the Company, the Compai
agrees to pay interest on the excess amount so withheld from the date of suspension at the sar
rate at which the Company borrows under its line of credit, and the amount so suspended shal
paid to the party to whom such payment is owed.

17.    Entire Agreement; Amendment. This Agreement constitutes the entire
Agreement among the parties with respect to the subject matter hereof and, unless otherwise
provided herein, supersedes all prior agreements or understandings written or oral in respect
thereof. This Agreement may be amended, modified, superseded, canceled, renewed, or
extended, and the terms or covenants hereof may be waived, only by a written instrument sigr
by all the parties hereto, or in the case of a waiver, by the party waiving compliance.

18.    Severability. If any provision of this Agreement shall be invalid or unenforcea
to any extent or in any application, then the remainder of this Agreement and of such term anc
condition, except to such extent or in such application, shall not be affected thereby, and each
and every term and condition of this Agreement shall be valid and enforced to the fullest exter
and in the broadest application permitted by law.

19.    Construction and Interpretation. This Agreement, and all questions arising ir
connection therewith, shall be governed by and construed in accordance with the laws of the
Commonwealth of Massachusetts. Employee acknowledges that she has been to the offices ol
the Company in Massachusetts in connection with the negotiation and diligence of the
Company's acquisition of the assets of TCG, that she will be required to travel to and/or
correspond and communicate regularly with the Company in Massachusetts in the performanc
of her duties hereunder, that all sales solicited by Employee may be accepted only by the
Company at its Massachusetts office, and therefore Employee hereby irrevocably consents to t
exclusive jurisdiction of the federal and state courts situated within said Commonwealth for
resolution of all disputes arising hereunder. Employee hereby waives any and all claims as to
whether jurisdiction or venue in said Commonwealth is proper.

20.    Headings. The Section headings contained herein are for convenience and
reference only, and shall be given no effect in the interpretation of any term or condition of this
Agreement.

[Signatures on next page]

8



**B**

## EMPLOYMENT AGREEMENT

EMPLOYMENT AGREEMENT made this 3rd day of $October$, 2003 by and between OPUS, Inc., a Massachusetts corporation with a principal place of business at 24 William Way, P.O. Box 525, Bellingham, MA 02019-0525 (the "Company") and Robert Campbell, an individual residing at 44 Green Acres, Morin Heights, Quebec, Canada J0R 1H( (the "Employee").

WHEREAS, as of the date hereof the Company has purchased substantially all of the assets of The Company Garden Inc., an Ontario corporation ("TCG"), pursuant to an Asset Purchase Agreement executed by and among the Company, TCG, the Employee, and Pamela Campbell (the "Asset Purchase Agreement");

WHEREAS, as an inducement to entering into the Asset Purchase Agreement and clos on the purchase of assets from TCG, the Company has required and Employee has agreed to enter into an employment agreement upon the terms set forth herein;

NOW, THEREFORE, in consideration of the mutual covenants and agreements set for herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Company and the Employee hereby agree as follows:

1.    Employment. The Company hereby agrees to employ the Employee, and the Employee hereby accepts such employment, upon the terms and conditions hereinafter set fon The Employee represents and warrants to the Company that his employment by the Company and the performance of his duties as contemplated by this Agreement do not and will not viola the terms or conditions of any other agreement or understanding by which the Employee is bound or subject, and that the Employee knows of no basis for any claim that he is so bound o subject.

2.    Term. This Agreement shall commence on the date hereof, and shall continue effect for a term of five (5) years unless earlier terminated as provided in Section 8 hereof.

3.    Duties. The Employee's primary responsibilities with the Company shall be in sales with particular emphasis on growing the product line previously introduced by TCG und the Country Nests Nids De Campagne® brand, as such line may hereafter be modified, enhanc and expanded by the Company during the term hereof. Employee shall have such other responsibilities consistent with his general experience and training as may be prescribed by the President of the Company from time to time. Employee acknowledges that his employment b the Company is full-time and that he shall at all times use his best efforts to discharge his dutic in furtherance of the Company's interests. The parties hereto affirm that Employee shall discharge his duties hereunder from his home unless a substitute location reasonably proximat to Employee's home is procured and such location is reasonably acceptable to Employee. The Employee agrees that in the course of his performance of duties, he will be required to travel both domestically and internationally as deemed necessary or appropriate by the Company, including without limitation, travel to sales, strategic planning, and product development

meetings conducted by the Company. All pre-approved travel expenditures will be paid by the Company subject to Employee's compliance with travel and expense guidelines utilized by the Company for its sales employees generally.

4.      Salary/Signing Bonus. As compensation for the services to be rendered by the Employee under this Agreement, the Company shall pay to the Employee a salary of Seventy-Five Thousand ($75,000) U.S. Dollars per year (the "Salary"), payable in accordance with the Company's normal payroll policies. In addition to payment of Salary, the Company also agree to remit to Employee a one-time signing bonus of Forty Thousand ($40,000) U.S. Dollars, payable upon execution of this Agreement. The Company agrees to adjust the signing bonus with a payment on or before January 31, 2004 of an additional Ten Thousand ($10,000) U.S. Dollars if and only if "net sales" by the Company of "Country Nests Products" for the period September 1, 2003 through December 31, 2003 exceeds net sales of Country Nests Products made by TCG for the same quarterly period in 2002. For purposes of this Agreement, (i) "net sales" means gross sales less GST, PST, any and all other sales and excise taxes, returns, allowances, and discounts and (ii) "Country Nests Products" means those products previously sold by TCG under the Country Nests Nids De Campagne® mark, together with all new and substitute products hereafter introduced by the Company for sale under the Country Nests Nids De Campagne® mark. In recognition that the Company will not have closed on its acquisition TCG assets until after September 1, 2003, the parties agree that sales of Country Nests Product from and after September 1, 2003 shall include sales made by TCG from and after such date through the date of closing.

5.      Incentive Bonus.

(a)     During each year of Employee's employment hereunder, Employee will be entitled to an annual incentive bonus equal to five (5%) percent of the amount by which net sal of "Eligible Products" (as measured in U.S. Dollars for the twelve (12) months ending on the d preceding each anniversary date of this Agreement) exceeds the "Applicable Base Amount". F purposes hereof, the initial Applicable Base Amount shall be One Million Sixty Two Thousand One Hundred Forty-Three ($1,062,143) U.S. Dollars, such amount representing net sales by TCG (as converted to U.S. Dollars) for the year ended July, 31, 2003. Commencing with the second and all successive years of the term of this Agreement, the Applicable Base Amount sha be the greater of (i) One Million Sixty Two Thousand One Hundred Forty-Three ($1,062,143) U.S. Dollars or (ii) the highest level of net sales of Eligible Products achieved for any twelve (12) month period ending on the day prior to an anniversary date of this Agreement. As used in this Agreement, the term "Eligible Products" means products now and hereafter sold by the Company and its parent, Opus, Inc., under the Country Nests Nids De Campagne® brand.

*For illustrative purposes only, assume this Agreement is executed September 30, 2003 and that net sales of Eligible Products are $1.3M and $1.7M for the twelve months ended on September 29, 2004 and September 29, 2005 respectively. The incentive bonus for the first employment year ended September 29, 2004 would be determined as follows: ($1,300,000 - $1,062,143) x 5% = $11,892.85. The incentive bonus for the second employment year ended September 29, 2005 would be ($1,700,000 - $1,300,000) x 5% = $20,000.*

2

(b)     All incentive bonuses will be paid within forty-five (45) days of the close of ea anniversary date of this Agreement. The Company agrees that it will increase the amount of tl incentive bonus to six (6%) percent for any employment year in which the Company's gross margin for sales of Eligible Products equals or exceeds 45.2%. The term "gross margin" mear net sales less cost of product, agent commissions, duty, freight, and broker fees. The Compan; agrees to include a statement of calculation of gross margin with each remittance of incentive bonus earned hereunder.

(c)     The parties hereto acknowledge that in the event the Company should sell all or substantially all of its assets and the purchaser thereof shall refuse either to assume this Agreement or assume the incentive bonus obligations owed to Employee under this Section 5, Employee will forfeit his valuable right to earn the bonus amounts provided in this Section 5. Accordingly, the Company agrees that upon the occurrence of any such event, Employee shall deemed to have earned a one-time fixed payment in lieu of the incentive bonus in the amount stated below:

| Date of Sale | Amount Earned |
|---|---|
| Prior to 2nd anniversary of this Agreement | $75,000 |
| Between 2nd and 3rd anniversary of Agreement | $50,000 |
| Between 3rd and 4th anniversary of Agreement | $40,000 |
| Between 4th and 5th anniversary of Agreement | $20,000 |

The Company agrees to remit the amount so earned within ten (10) days following closing of ai such sale. Notwithstanding the foregoing, should a purchaser offer employment to Employee a a comparable base salary with an incentive bonus substantially comparable to that stated in subsection (a) above, and such employment is refused by Employee, the Company shall be relieved of its obligation to remit any fixed payment to Employee under this subsection (c) and Employee shall be deemed to have forfeited his right to receive any payment under this subsection.

6.     Reimbursement of Business Expenses. The Company agrees to reimburse the Employee for all reasonable out-of-pocket expenses incurred in connection with Company business in accordance with the policies of the Company, as those policies may be amended or modified from time to time. Reimbursable expenses include, without limitation, authorized travel, cell phone, office and business supplies.

7.     Vacation/Benefits.

(a)     The Employee shall be entitled to four (4) weeks paid vacation per year.

(b)     The Company shall provide the Employee with dental and prescription coverage comparable to benefits historically provided to Employee by TCG.

(c)     In lieu of an automobile allowance, the Company shall reimburse the Employee (or TCG) for the lease payment associated with a 2000 Toyota Tundra, (which vehicle is under

3



lease with TCG), for the remaining term of said lease. Said vehicle shall be used by Employe
primarily for business purposes only. The Company also agrees to reimburse the Employee (
TCG) for all insurance, registration, service, repair, and fuel (for business use only) and any a
all other expenses associated with the operation and maintenance of such vehicle. Upon
conclusion of the lease, the Company agrees to absorb any excess mileage charges. Upon leas
expiration, the Company will thereafter provide Employee with an automobile allowance in th
amount of Three Hundred Fifty ($350) U.S. Dollars per month during the remainder of the ˚er
of this Agreement. If an allowance is provided to Employee, the Employee understands that
shall be responsible for all insurance, registration, service, repairs, fuel (subject to mileage
reimbursement for business use), and any and all other expenses associated with the operation
and maintenance of such vehicle.

8.    Termination.

(a)    This Agreement shall terminate immediately in the event of the Employee's
death. Should the Employee become physically or mentally disabled or ill to the extent that he
unable to substantially perform his duties hereunder to the reasonable satisfaction of the
President of the Company (i) for a period of ninety (90) consecutive days, or (ii) for shorter
periods aggregating ninety (90) days during any period of three hundred sixty-five (365)
consecutive calendar days, the Company may, at its option, elect to terminate the Employee's
employment at any time thereafter while such disability or illness continues by giving writte:1
notice thereof to the Employee. If the Company believes Employee to be physically or mentall
incapable of performing the services required of him hereunder, the Company may require
Employee to be examined by a physician selected by it to verify or to determine the extent oĭ
such disability and such physician's determination, as certified to the Company, as to whether
Employee is or is not capable of performing the services required of him hereunder, shall be
binding and conclusive. In the event Employee's employment hereunder shall terminate on
account of death or disability, the Company agrees that it will continue to pay to the Employee
(or his estate following death), as a death or disability benefit, the incentive bonus referenced ir
Section 5 above to the extent earned during the balance of the term, as fully as if Employee's
employment had not in fact terminated on account of death or disability. In addition, should
Employee's employment hereunder terminate on account of death or disability prior to the date
that Employee has received payment in full for his non-competition and non-solicitation
covenants set forth in Section 10 hereof, the Company hereby agrees that it will pay the
remaining amounts due in consideration of such covenants as a death benefit and/or as a
separation/disability benefit at the time(s) set forth in said Section 10 for payment thereof.

(b)    In addition to termination on account of death or disability, the Company
may, upon written notice to the Employee, terminate the Employee's employment under this
Agreement for just cause. As used herein, "just cause" shall mean the Employee has engaged
in: (i) willful and substantial misconduct with respect to the business and affairs of the
Company; (ii) gross neglect of duties, dishonesty, deliberate disregard of any material rule or
policy of the Company, or the commission by the Employee of any other action with intent to
injure the Company; (iii) commission of an act involving larceny, embezzlement, or conversion,
or any act involving the misappropriation of Company funds; (iv) any activity resulting in a
conviction for any crime pertaining or relating to the Company; (v) repeated failure to be prese

4

at work during normal business hours; (vi) violation of an express directive or any rule or regulation established by the President of the Company, which violation continues uncured fo ten (10) days after written notice thereof has been given to the Employee (provided that Employee shall not have the right to cure successive violations of the same or similar directive (vii) abuse of alcohol or other drugs; (viii) violation of the confidentiality, non-competition, o non-solicitation covenants set forth herein, or (ix) the material breach of any other covenant, condition or agreement contained in this Agreement or in the Asset Purchase Agreement. In addition to the foregoing, Employee understands that his employment is linked to the employment by the Company of his wife, Pamela Campbell. Should the Company terminate Pamela Campbell's employment for just cause under the terms of her employment agreement, Employee acknowledges that his continued employment with the Company would create a difficult and unacceptable situation for the Company constituting just cause for the Company terminate Employee hereunder. In the event Employee shall be terminated for just cause, Employee shall be entitled to receive all compensation then due and owing together with any incentive bonus previously earned and unpaid as of the date of such termination.

9.    Confidentiality.

The Employee hereby acknowledges that during the term of his employment hereunder, he will have access to confidential information of the Company, including marketir strategies, concepts, product designs, names of suppliers, customers, channel partners, manufacturers, and key employees, inventions, branding strategies, sales, cost and select financial information, and all information which prior to the date of acquisition of the assets of TCG by the Company was properly regarded as confidential and proprietary by TCG (collectively, "Confidential Information"). During the term of Employee's employment and at any time thereafter, Employee agrees that he shall not divulge or cause to be divulged, communicate or cause to be communicated, publish or cause to be published, or otherwise disclose or cause to be disclosed to any person, firm, corporation, association, or entity, any of the Confidential Information except as required to discharge his employment responsibilities hereunder. For purposes hereof, Confidential Information shall not include information which (a) at the time of disclosure to Employee was generally known to the relevant trade so as to no longer be a protectable trade secret, or (b) was lawfully received by Employee from a third par who independently, without prompting or assistance by Employee, developed or acquired such Confidential Information free of any obligation, express or implied, to the Company with respe thereto.

10.    Non-Competition and Non-Solicitation.

(a)    The Employee hereby acknowledges that the Company would not have entered into the Asset Purchase Agreement to purchase the assets of TCG or entered into this Agreement in the absence of Employee's covenants set forth in this Section 10. In furtherance thereof, Employee understands that the Company's success in operating and expanding the business previously conducted by TCG is highly dependent on maintaining customer, vendor, and manufacturing relationships and the goodwill associated therewith. Accordingly, in order t protect the goodwill of the Company and all Confidential Information, Employee hereby agree:

that during the term of his employment by the Company and for a period of two (2) years
following any termination or expiration thereof, Employee will not:

> (i)     directly or indirectly, either as an individual for Employee's own accou
> or as a partner or joint venturer, or as an advisor, consultant,
> representative, employee, officer, director, or shareholder of any
> corporation or other business entity, or in any other capacity, engage in
> enter into or participate in any way in any enterprise that is involved in
> development, manufacture, distribution, or sale within the United State
> Canada of bird feeders, bird houses, knewel posts, candles, watering ca
> Adirondack chairs, benches, Christmas ornaments, bistro tables, or any
> other products which now or hereafter at any time during the term of
> Employee's employment are sold (or under active consideration for sale
> by the Company; or

> (ii)    directly or indirectly hire away or attempt to hire away or otherwise
> engage any employee, key advisor, or consultant of the Company.

(b)     In consideration for the covenants set forth in subsection (a) above, the
Company agrees that it shall pay to the Employee the sum of Sixty-Five Thousand ($65,000)
U.S. Dollars (the "Non-Competition Payment"). The Company has agreed, as an
accommodation to the Employee, to remit the Non-Competition Payment in two (2) equal
installments of Thirty-Two Thousand Five Hundred ($32,500) U.S. Dollars, payable on the fir
and second anniversary dates of this Agreement. Employee acknowledges that the foregoing
restriction is reasonable as to duration and scope, and has been bargained for as part of the
transaction involving the Company's purchase of assets from TCG and the Company's
commitment to provide employment to the Employee upon the terms set forth in this Agreeme
Employee expressly affirms that the Non-Competition Payment constitutes fair and adequate
consideration for such covenants, notwithstanding that payment may be made in full prior to th
date of any termination or expiration of this Agreement. In the event Employee shall violate o
challenge the enforceability of the terms of this Section 10, Employee agrees to return to the
Company all monies received as his Non-Competition Payment.

11.     Assignment of Intellectual Property.  Acknowledging that Employee will be
involved in the design and development of new products for the Company, Employee hereby
irrevocably assigns to the Company his entire right, title and interest in and to all inventions,
improvements, discoveries, designs, product ideas, sketches, models, and other works of
authorship, whether or not the subject of trademark, patent, industrial design or copyright
protection (collectively "Intellectual Property") made, created, developed or reduced to practic
by the Employee during the period of his employment with the Company, whether alone or
jointly with other persons, and resulting from or arising out of any work performed by the
Employee on behalf of the Company or connected with any matter relating or possibly relating
any business in which the Company is involved. The Employee further irrevocably and
expressly waives in favour of the Company and its successors and assigns any and all moral
rights that he may have in the Intellectual Property. The Employee agrees to promptly disclose
to the Company all Intellectual Property and shall cooperate fully with the Company to obtain

6

for the benefit of the Company or its assignees any patents, trademarks, copyrights or industr design protections thereon, and to execute and deliver to the Company any applications and assignments and any other lawful documents deemed necessary by the Company to carry out purposes of this Section 11, all without further consideration. In furtherance of the forego:n; the Employee hereby irrevocably designates and appoints the Company and its duly authoriz officers and agents as his agent and attorney-in-fact, to act for and in his behalf and stead to execute and file any such application and to do all other lawfully permitted acts to further the prosecution and issuance of trademarks, patents, industrial designs or copyrights or other analogous protection with the same legal force and effect as if executed by the Employee.    1 Section 11 shall survive the termination or expiration of this Agreement.

    12.    Survival of Covenants/Injunctive Relief. The Employee recognizes that the covenants and agreements contained in Sections 9, 10 and 11 above have significant commerc value, are critical to the protection of the Company's Confidential Information, trade secrets, goodwill, and that the Company would be irreparably damaged, and its investment in the asse of TCG materially impaired, if the Employee was to engage in any violation thereof. Accordingly, the Employee expressly acknowledges that he is voluntarily entering into this Agreement and that the terms and conditions contained herein, including Sections 9, 10 and 1 are fair and reasonable to the Employee in all respects. The Employee hereby further acknowledges that the Company's remedy at law for breach or threat of breach of the provisio of Sections 9, 10 or 11 is inadequate and that the Company shall have the right to seek injunct relief in the event of any such breach or threatened breach, in addition to any other remedy available to the Company. If any provision of Sections 9, 10 or 11 shall be invalid or unenforceable to any extent or in any application, the parties hereto agree that the remainder o said Sections and of such terms and conditions shall not be affected thereby, and each and eve term and condition of said Sections shall be valid and enforced to the fullest extent and in the broadest application provided by law. If the invalidity or unenforceability is due to the unreasonableness of the time or scope or geographic extent of any covenant and restriction, sa covenant and restriction shall nevertheless be effective for such period of time or within such scope or geographical area as may be determined to be reasonable by a court of competent jurisdiction. All of said covenants shall survive any expiration or termination of this Agreeme in accordance with their terms.

    13.    Waiver of Breach. The failure of any party at any time or times to require performance of any provision hereof shall in no manner affect that party's right at a later time enforce the same. No waiver by any party of the breach of any term or covenant contained in this Agreement, whether by conduct or otherwise, in any one or more instances, shall be deemn to be, or construed as, a further or continuing waiver of any such breach, or a waiver of the breach of any other term or covenant contained in this Agreement.

    14.    Assignment. This Agreement shall be binding upon and inure to the benefit of t Company and its successors and assigns and shall be binding upon the Employee and his heirs, executors and administrators.

    15.    Impact of Breach by the Company. The Company acknowledges that should it be judicially determined that it (and not the Employee) has materially breached the terms of thi

7

Agreement, and that as a result thereof, Employee has been excused of any further performan the Company shall remain liable to Employee for all amounts that otherwise would be due hereunder as if this Agreement had not been so breached.

16.    Right to Suspend. In the event the Company shall assert any claim by way of indemnification against Employee for matters arising under the Asset Purchase Agreement, th Company may suspend payment of the incentive bonus and/or the Non-Competition Payme it an amount equal to what the Company claims to be due. If it shall be determined that the arno suspended and claimed to be due is in excess of what is in fact due the Company, the Compan agrees to pay interest on the excess amount so withheld from the date of suspension at the sam rate at which the Company borrows under its line of credit, and the amount so suspended shall paid to the party to whom such payment is owed.

17.    Entire Agreement; Amendment. This Agreement constitutes the entire Agreement among the parties with respect to the subject matter hereof and, unless otherwise provided herein, supersedes all prior agreements or understandings written or oral in respect thereof. This Agreement may be amended, modified, superseded, canceled, renewed, or extended, and the terms or covenants hereof may be waived, only by a written instrument sign by all the parties hereto, or in the case of a waiver, by the party waiving compliance.

18.    Severability. If any provision of this Agreement shall be invalid or unenforceat to any extent or in any application, then the remainder of this Agreement and of such term and condition, except to such extent or in such application, shall not be affected thereby, and each and every term and condition of this Agreement shall be valid and enforced to the fullest exten and in the broadest application permitted by law.

19.    Construction and Interpretation. This Agreement, and all questions arising in connection therewith, shall be governed by and construed in accordance with the laws of the Commonwealth of Massachusetts. Employee acknowledges that he has been to the offices of t Company in Massachusetts in connection with the negotiation and diligence of the Company's acquisition of the assets of TCG, that he will be required to travel to and/or correspond and communicate regularly with the Company in Massachusetts in the performance of his duties hereunder, that all sales solicited by Employee may be accepted only by the Company at its Massachusetts office, and therefore Employee hereby irrevocably consents to the exclusive jurisdiction of the federal and state courts situated within said Commonwealth for resolution of all disputes arising hereunder. Employee hereby waives any and all claims as to whether jurisdiction or venue in said Commonwealth is proper.

20.    Headings. The Section headings contained herein are for convenience and reference only, and shall be given no effect in the interpretation of any term or condition of this Agreement.

[Signatures on next page]

8

IN WITNESS WHEREOF the parties have executed this Agreement as of the day and year first above written.

OPUS, INC.

By: _____
John Stone, President

EMPLOYEE:

_____
Robert Campbell

182283.4

C



**OPUS**
24 William Way
PO Box 525
Bellingham MA
02019-0525
508.966.0470 tel
508.966.3182 fax

August 12, 2005

Pamela Campbell
44 Green Acres
Morin Heights, Quebec
Canada J0R 1H0

Dear Pam,

This letter represents formal notice that your employment with Opus is being terminated for "just cause" pursuant to Section 8(b) of your employment agreement. Termination is effective Monday, August 15, 2005.

Under the terms of your employment agreement with Opus, you are required to work full-time and at all times use your best efforts to further Opus' business interests. While your contract does not provide express sales quotas, it is quite clear that based on your performance to date, there has been a marked lack of effort and commitment in soliciting gift business throughout Canada.

Last fall, you were given a 15 month quota of $100,000 and to date (10 months) your performance has come up short of this goal by more than $52,000. We have long suspected that these results reflect a less than full-time effort on your part. This position is borne out by the meager activity level evident in your e-mail report to Andy on August 2. Your e-mail primarily reports difficulties which independent representatives have communicated to you from the field. The description of July activities reveals little, if any, direct participation on your part in terms of visiting sales reps, making appointments with customers, or otherwise inserting yourself into the sales process to assist in the generation of business for Opus in the gift category. Direct participation is an essential part of your sales responsibilities.

The fact that Opus agreed to let you discharge your responsibilities from home was never intended to mean that you could work when and if you felt like it. There is no way your performance to date or your own report of activity in July is consistent with a full-time effort. In Opus' judgment, you have not acted diligently in the performance of your duties.

Nancy Drake will be contacting you shortly to arrange for the return of all company materials. Opus will remit payment to you for all amounts due through the August 15 termination date, as well as other amounts, if any, deemed payable under applicable law.



*Bringing Nature Home*

If you have questions or wish to discuss this matter further, have your counsel contact our lawyer, Barry Gold, @ 617-482-8200.

Sincerely,

Michael J. Reilly
President/COO

**D**

Aug 16 05 09:40a        Opus Inc                508-966-0559              p.4



**OPUS**
24 William Way
PO Box 525
Bellingham MA
02019-0525
508.966.0470 tel
508.966.3162 fax

August 12, 2005

Robert Campbell
44 Green Acres
Morin Heights, Quebec
Canada J0R 1H0

Dear Bob:

As you presumably know, Opus has terminated the employment of your wife Pam for "just cause" under Section 8(b) of her employment agreement. Section 8(b) of your employment agreement provides that termination of your spouse with just cause also constitutes grounds for termination of your employment. Accordingly, this letter serves as confirmation that effective August 15, 2005, your employment with Opus has terminated.

Opus' decision to terminate your employment for the reason stated above should not be construed as any admission that you have acted diligently in the performance of your job responsibilities or that Opus does not have separate and independent grounds to terminate your employment for "just cause" under your employment agreement.

Nancy Drake will be contacting you shortly to arrange for the return of all company materials. Opus will remit payment to you for all amounts due through August 15, as well as other amounts, if any, deemed payable under applicable law. If you have any questions or wish to discuss this matter further, have your counsel contact our lawyer, Barry Gold @ 617-482-8200.

Sincerely,

Michael J. Reilly
President/COO

*Bringing Nature Home*

E



# LEVINE FRISHMAN

Société en nom collectif • General partnership

**Zavie Levine**
Téléphone : (514) 939-3355 poste 41
Télécopieur : (514) 939-3356
Courriel : zlevine@levinefrishman.com

August 17th, 2005

<u>**WITHOUT PREJUDI**</u>
<u>**VIA TELECOPIER: (508) 966-31**</u>
<u>**ORIGINAL TO FOLLOW BY MA**</u>

**OPUS, Inc.**
24 William Way
BELLINGHAM (MA)
02019-0525 U.S.A.

<u>**Attention: Mr. Michel J. Reilly**</u>

**RE:    Robert & Pam Campbell**
       **-vs- Opus, Inc.**
<u>       **Our file: CA-003-05**</u>

Dear Mr. Reilly:

We have been engaged by both Pamela Campbell and Robert Campbell t
communicate with you with regard to your letters of August 12th, 2005
terminating the services of our clients with Opus.

You take the position that Mrs. Campbell was terminated for "just cause", a
per Section 8(b) of the Employment Agreement.

We have read the said article and cannot find any reasoning in your letter tha
would give rise to a termination for "just cause".

Moreover, if you were dissatisfied with the services rendered by Mrs. Campbell
a senior employee of your Canadian operation, you would certainly be require(
to provide her with a written notice as to why you were dissatisfied with he:
performance and give her an opportunity to remedy any alleged default.

For the record, our client denies emphatically that she is directly responsible
for the paucity of Opus' sales made by her team of sales representatives across
Canada.

3500, boul. de Maisonneuve ouest, Bureau 1600, Westmount (Québec)  H3Z 3C1

## LEVINE FRISHMAN
▬▬▬▬▬▬▬▬▬▬

- 2 -

On many occasions our clients advised Andy Schleifstein that there were vali reasons for the lack of sales in Canada.

Opus has its own existing sales force in Canada, which sells to both th majors, chains and the distributors who have their own networks across th country.

As a result, the sales agents that report to our clients cannot sell to thea customers. This leaves the "Ma" and "Pa" stores across the country, most c whom are also solicited by your distributors so are off limits to our clients sales representatives.

For example, in the Province of Ontario, *"Wild Bird Trading"* is a distributo: that sells Opus products across that Province and has contacted virtually al proposed customers. Our clients' sales agents cannot deal with these outlets.

This is unfortunate because what is left to our clients sales representatives are customers that either cannot afford to pay the expensive freight charges or, are not credit-worthy.

Moreover, the refusal of Opus to attend any trade shows in Canada has not been helpful.

It is interesting to note that Mr. Stone recently advised Mr. Bob Campbell that the purchase by Opus of our clients' business was a huge mistake because the products developed by our clients do not translate to the mass market which you had anticipated.

In furtherance of the negative attitude that your company has developed against our clients. Mrs. Campbell, who is in charge of sales, was not invited to any sales meetings in the U.S. nor, was Mr. Bob Campbell, who is in charge of new product development in Canada invited to new product meetings in the U.S.

It is evident that once you have made a determination that the products do not translate well to the nature of the market to which you cater, you have decided to find any reason whatsoever to terminate the obligations that you have towards our clients in virtue of the Employment Agreements dated October 3rd, 2003.

If you consider that you made a bad deal with our clients, our clients should not suffer prejudice. You have encountered obligations to our clients, which we expect to be honoured in full.

## LEVINE FRISHMAN

– 3 –

In our view, your reasons for terminating the agreements are invalid and will t contested in a Court of law, if necessary.

In addition, as our clients were fired for "no just cause", if this matter is nc resolved amicably, they intend to file claims with the Quebec Labour Standar Commission alleging a dismissal for "no just cause". In virtue of Article 124 c that law, should the Labour Commissioner agree with our position, he/sh would have no other recourse but to order them back to their jobs, togethe with all back-pay and damages.

This letter shall serve as formal notification that our clients tender thei services to your company and are prepared to fulfill all their obligations under the Employment Agreements.

Should this be unacceptable to yourselves and you do not confirm that the August 12th letters of termination are cancelled, and this, in writing, by August 24th, 2005, you would leave us no alternative but to institute proceedings against yourselves for the balance owing to our clients under their Employment Agreements.

According to our clients, as the Employment Agreements run from August 15th to October 1st, 2008, a period of 37 ½ months, their claims would be as follows:

|       |                                                                                                                                               |                   |
|-------|-----------------------------------------------------------------------------------------------------------------------------------------------|-------------------|
| (i)   | base salary of $75,000.00 U.S. per annum each, our clients would be entitled to ($12,500.00 x 37.5):                                           | $468,750.00       |
| (ii)  | cell phone, fax, medical insurance and internet service, would be calculated to be worth an additional $350.00 U.S. per month ($350.00 x 37.5): | $ 13,125.00       |
| (iii) | car allowance of $350.00 U.S. per month each ($700.00 x 37.5):                                                                                | $ 26,250.00       |
| (iv)  | our clients are each entitled to $32,500.00 U.S. on October 4th, 2005, as the balance owing under the non-compete clause:                  | $ 65,000.00       |

**TOTAL:**                                                                                                                                               **$573,125.00 U.**

# LEVINE FRISHMAN

- 4 -

We are of the opinion that proceedings can be instituted in Quebec to enforc
our clients rights under the Employment Agreements, notwithstandin
paragraph 19 of the contract.

We trust that we shall have your positive response by August 24th, 2005
revoking the letters of August 12th, 2005.


Yours very truly,

LEVINE FRISHMAN

Per: ZAVIE LEVINE
/mp